OVERTON, Administrator of LOUISA KERSTING,
Respondent, v. WHITE, Appellant.

St. Louis Court of Appeals, March 13, 1906.

1. **SLANDER AND LIBEL: Practice: Pleading Privilege: Consistent Theories.** In an action for slander where the defendant denied uttering the slanderous words, he could not claim that the words were privileged; but where the case was tried on the theory that he was entitled to show his communication was privileged, the case will be determined on appeal on that theory.

2. ———: ———: **Privileged Communications: Jury Question.** In an action for slander where the defendant claimed a privilege in the communication of information received by him, and there was evidence tending to show the information received was not slanderous and his statement false and uttered in bad faith, it was a question for the jury whether the communication was privileged, although spoken under circumstances which would otherwise make it privileged.

3. **PRACTICE: Evidence: Abandoned Pleadings.** In an action for slander, abandoned answers of the defendant, admitting the utterance of the slanderous words and claiming a justification, were admissible in evidence on the part of the plaintiff, although the defendant did not authorize his attorney to make such admissions.

4. ———: ———: ———: **Surrounding Circumstances.** But when such abandoned answers were admitted in evidence, it was proper for the defendant to show any circumstances in explanation which would detract from their significance.

5. **SLANDER AND LIBEL: Privileged Communication: Evidence: Rumors.** In an action for slander, where the defendant claimed the alleged slanderous words were privileged because uttered to members of a society whose duty it was to investigate the conduct of the plaintiff, rumors in the neighborhood that plaintiff was guilty of the conduct charged by the alleged slander were not admissible in defense because the evidence showed that the investigation by the society was not made upon such rumors but on other information. ·

6. **PRACTICE: Remarks of Counsel: Correction of Statement.** Where counsel in arguing a case to the jury made objectionable statements in his argument, but upon reproof of the court promptly corrected the same, there was no reversible error.

7. **SLANDER AND LIBEL:** Excessive Verdict. In an action for slander where the slanderous words affected the good character of the plaintiff, a woman, the verdict of $2,000 was not sufficient to show the jury was prejudiced or influenced by passion.

Appeal from St. Louis County Circuit Court.—*Hon. John W. McElhinney,* Judge.

AFFIRMED.

*Kinealy & Kinealy* and *G. A. Wurdeman* for appellant.

(1) The communication to Mr. Henry was privileged, and therefore the judgment ought to be reversed. Kersting v. White, 107 Mo. App. 265, 80 S. W. 730. (2) What is shown by uncontradicted and unimpeached testimony is now presumed in this State to be true, and may be so assumed in an instruction. Weldon v. Railway, 93 Mo. App. 668, 67 S. W. 698; Bertram v. Railway, 154 Mo. 639, 55 S. W. 1040; Hendrickson v. Kansas City, 177 Mo. 488, 76 S. W. 1045; Parks v. Railway, 178 Mo. 108, 70 S. W. 70. (3) The eighth instruction, which was given at the request of the plaintiff, was erroneous. Trask v. Ins. Co., 58 Mo. App. 431; Winter v. Sup. L. K. of P., 96 Mo. App. 18; Macarty v. Foucher, 12 Mart (O. S.) 114; Allen v. Blunt, Fed. Cas. No. 217; Ins. Co. v. Marple, 1 Ind. App. 411. (4) Plaintiff failed to show that she suffered any damages in consequence of the speaking of any words to Henry by defendant and the judgment was excessive. Herman v. Bradstreet Co., 19 Mo. App. 232; 18 Am. & Eng. Ency. Law (2 Ed.), 1081. (5) The judgment should be reversed because of the actions and remarks of Mr. Crigler, one of defendant's counsel on the trial, and of his statements in his closing speech to the jury, and of the failure of the court to correct him or withdraw those expressions from the

jury, and it should also be reversed because of improper remarks to the jury of Mr. Shackelford, another of plaintiff's counsel. 14 Ency. Pl. & Pr., 992, par. 4; Smith v. Tel. Co., 55 Mo. App. 626; Evans v. Trenton, 112 Mo. 390, 20 S. W. 614; Massengale v. Rice, 94 Mo. App. 430, 68 S. W. 233.

*L. P. Crigler* for respondent.

(1) Defendant admits saying that he told Henry that Elms was living in sin, and that plaintiff's name was mentioned as being a participant in said sinful life." Now can he say his counsel could bind him by using the privilege theory, set up in answers, and not bind him "as to what is against him." He is bound by his answers, and they were proper submissions to the jury. Walser v. Wear, 141 Mo. 463, 42 S. W. 928; Anderson v. McPike, 86 Mo. 293. (2) Plaintiff was not required to read the entire answers. Gunns' v. Todd, 21 Mo. 303; Kritzer v. Smith, 21 Mo. 296. (3) If the alleged statements to Henry by White are privileged, why were they abandoned, and why does he now deny them? Can defendant say "They are true" and then, that "he did not say them." His positions were properly submitted to the jury; it was a question for them to pass upon. Kersting v. White, 107 Mo. App. 265, 80 S. W. 730. (4) As to excessiveness of the verdict, the Supreme Court in Minter v. Bradstreet, 174 Mo. 504, 73 S. W. 668, the question of amount in cases of this sort is said to admit of no other test, than the intelligence of the jury (in arriving at it), governed by a sense of justice. "The task is theirs." (5) It is only when their actions seem to shock the understanding, and express no dubious conviction of their passion and prejudice, that the courts will interpose." Dowd v. Air Brake, 132 Mo. 579, 34 S. W. 493; Pritchard v. Hewitt, 91 Mo. 547, 4 S. W. 439; McCloskey v. Pub. Co., 163 Mo. 22, 63 S. W. 99.

STATEMENT.—The action is for slander and this is the second appeal of the cause. On the first appeal the judgment was reversed for the admission of incompetent evidence (107 Mo. App. 265). After the second trial, which resulted in a verdict for plaintiff, she departed this life and the cause has been revived in the name of her administrator. The material allegations of the petition (the second amended one) on which the case was tried, are as follows:

"That for and during the last year from about October, 1900, to the time of filing this petition, plaintiff was in the employ of one J. C. Elms, as a servant for hire at his residence in Woodland, St. Louis county, Missouri, and as such servant she had charge of the house and household affairs of J. C. Elms, together with the care and custody of his three small children, he, the said Elms being during all this time a widower, and he, the said Elms during all this time was living and making his home at this said residence in Woodland, where and in which said residence he and his minor children and this plaintiff were living together; and the fact that plaintiff was in the employ of the said Elms as a servant at his house and home in Woodland; and that the plaintiff was living there in the same house and home at Woodland with the said Elms as his servant; and that the said Elms lived at his home in Woodland, at all times hereinafter mentioned, were known to the defendant and to the said Edward Henry hereinafter referred to.

"For cause of action plaintiff states that at a date unknown to her, but within two months prior to the filing of this petition and about the last of May or the first of June, 1901, in the city of St. Louis, and in the presence of one Edward Henry, a citizen of St. Louis, and at that time an employee of a large dry goods establishment of the city of St. Louis, and to the said Edward Henry, defendant used and published the following false and slanderous words, to-wit: "Mr. Elms and Miss Kersting are living in sin together at Elms' house." And that

when the above words were spoken by the defendant to the said Henry, both Henry and defendant knew of the relation of master and servant existing between plaintiff and Elms; knew that they lived together in the same house, and knew that J. C. Elms was a widower and that plaintiff was an unmarried woman in his, Elms,' employ as a house-servant at that time.

"That by said words so used the defendant intended to and did refer to this plaintiff and that by said words he intended to and did charge the plaintiff with the offense of cohabiting with the said Elms, and with being a fornicatress; and that the said words were so understood by the said Henry at the time they were spoken to him.

"That said words so spoken, used and published were and are false; that they were known to be false by defendant at the time he spoke them; that they were falsely and maliciously spoken by defendant of and concerning this plaintiff and were spoken with the intent and purpose of defaming the good name and reputation of plaintiff.

"That by said false, slanderous and malicious words spoken, used and published as aforesaid, plaintiff was made to suffer great mental pain, was greatly damaged in her good name and fame; and that by said false and malicious words spoken, used and published, as aforesaid, plaintiff's reputation as a pure, virtuous and chaste woman was and is greatly injured; and that she has suffered great humiliation and disgrace thereby; that she has been brought into contempt and ridicule; exposed to public wrath and hatred, and deprived of the public countenance and social intercourse amongst her former friends and acquaintances, all to her damage in the sum of $25,000. Wherefore plaintiff prays judgment against defendant in the sum of $25,000 and for her costs."

Omitting caption, the answer (the fourth one) on which the case was tried, is as follows:

"Defendant by leave of court files this his amended answer to plaintiff's second amended petition and says that he was informed and believes that plaintiff was living in the house of said Elms in the fall of the year 1900 and in 1901; that said Elms and some of his small children were then living there, and that said Elms was then a widower; and defendant also says that in June, 1901, he stated to said Henry, under circumstances hereinafter set forth, that a daughter of said Elms had charged her father with living in sin at his house, and defendant denies every other allegation in said petition set forth.

"And defendant further states that on or about June, 1900, said Elms was a widower, and he with his three married daughters and his son James and two or three quite small children, the latter being of his last marriage, all lived at the residence of said Elms at his house in Woodland, St. Louis county, Missouri; that said Elms had previously been a member of a society of Christian men and women then and yet existing in said Woodland, and in said city of St. Louis, known as the 'Brethren,' and whose members bound themselves to live truly Christian life according to the teachings of the Holy Scriptures, and to retain none in their society who did not live such a life, and of which society defendant was a member at all times hereinafter mentioned; that said Elms up to the year ———— had been a member of said society, but in that year he was expelled from said society because of the belief of its other members that he was unworthy to be one of them; that subsequently said Elms made in writing to said society a confession of his unworthiness, a profession of repentance, and an application for readmission, and on it was readmitted to fellowship by said members, but because of the nature of his former offenses as confessed by him as aforesaid, he was, thereafter, more or less, an object of watchfulness on the part of said members lest he should again show himself unworthy of their fellowship;

that on or about the autumn of 1900, the said married daughters of said Elms removed to the city of St. Louis, and plaintiff was employed by said Elms and went to live at his house in Woodland aforesaid, and soon after and while plaintiff resided at the house of said Elms it was currently reported in said Woodland and to and amongst said members that she performed, and said Elms caused her to perform, services for him of a nature which led to remarks unfavorable to her and to said Elms and were also calculated to cause said members to institute an inquiry as to the fitness of said Elms to remain in said society under it rules; that some months after the plaintiff commenced to reside at the house of said Elms, his said son James left his father's house after a quarrel with his father and plaintiff, and afterwards, from about January 1, 1901, and in February and March, 1901, said son and the said daughters of said Elms, spread amongst the members of said society reports concerning said Elms and his acts including all the matters aforesaid and charged him with living in sin, and said daughters privately and at public meetings of the said members related to said members their said charges and said reports and stated said charge to this defendant and demanded of said members, including this defendant, that their father be expelled from said society or forced to abandon his alleged evil ways; that in January, February and March, 1901, those aforesaid reports and statements became known in said Woodland, which is largely inhabited by said members, and known to said members, and in consequence of the aforesaid previous acts of said Elms and of his said confession and in consequence of said reports, statements and the said demands of the said daughters of said Elms, and of statements of his son derogatory to said Elms which were known in the months last mentioned in said Woodland, and to said members, the said Elms became an object of suspicion to the other of said members and they instituted an inquiry to ascertain whether or not said Elms were in-

deed living in sin, to the end that if he were found, to be so living proper steps should be taken to expel him from said society as an unworthy member, or to procure a reformation of his life and conduct. That thereupon, members of said society were, by said society, directed to ask an explanation from said Elms of his conduct and of said reports, and in obedience to said direction did so, and notified him of the charge made by his said daughters and of said reports, and asked him to state his defense thereto, if he had any, with the result that after a long time spent in said inqury and in expostulating with said Elms, no satisfactory answer or explanation being obtained, he said Elms, was requested not to attend the meetings of said society, and thereupon he ceased to attend such meeting or to be regarded as one of its members.

"Defendant further states that said charge and said reports made as aforesaid were of such a nature that coming from the said daughters and said son of said Elms, they would awaken suspicion and distrust of reasonable and fair-minded persons as to the life then led by said Elms, and were generally believed in the neighborhood and by said members; that said daughters and said son of said Elms were known as persons who led good Christian lives and were regarded as truthful persons and hence their statments were generally regarded as true during said months of January, February and March, 1901, at said Woodland, and amongst said members.

"Defendant further states that said Edward Henry and defendant were, during the year 1900 and 1901, members of said society in good standing; that said Henry had been a frequent visitor at the house of said Elms in 1900 and before March, 1901, and had witnessed some of the mode of life led by said Elms and of some members of his household, and related what he so learned to others of said members, and stated that because of what he saw there, he ceased to visit said Elms, and because

of his said knowledge acquired as last mentioned and
of said charges, statements and reports and of the earn-
est request of Elms' said daughters, he, said Henry, with
one Meyer and other members of said society, were di-
rected and deputed by said society to call, and did there-
upon call, on said Elms for an explanation of his alleged
conduct above stated, and for an answer to said charge
and to make other inquires as to the truth of said reports
and statement, which they did; and in the course of said
inquiries and while they were being made, he, said
Henry, met the defendant, who then knew of said inves-
tigation and whose duty it was to aid it, and who knew
that said Henry was engaged in making it and was in
consultation with said Meyer on said matters, and on
said inquiry and in answer to an inquiry of said Henry
and in discharge of his said duty, the defendant then and
in good faith there stated to said Henry the charge afore-
said made to defendant by the daughters of said Elms,
who were Mrs. Blanch Ward, particularly, Mrs. Jennie
Ward and Mrs. Laura Fulton, and stated to him then
and there the name of his informant and the time and
place when the aforesaid statement was made to him
by said daughters of said Elms and each of them, and
did so solely for the purpose of aiding in said investiga-
tion and performing his duty as such member and in
good faith and without any malice towards said Elms or
plaintiff or any other person.

"And defendant states that he believed that the
statement he then and there made to said Henry was
true when he made it; that no other person was present
when he made said statement to said Henry; that said
Henry then and there stated to defendant that he had
already heard that statement and that he believed said
Elms was guilty of the charge made against him as afore-
said, because of the acts he had himself witnessed in the
house of said Elms as above stated; and the foregoing
statement of defendant to said Henry and no other, con-
stituted the alleged slander charged by plaintiff to have

been spoken by defendant to said Henry and the speaking of the same and the circumstances under which they were spoken, and defendant says that the statement made by defendant to said Henry was a privileged communication, and because of the aforesaid facts and matters defendant prays to be hence dismissed with his costs."

The reply was a general denial of the new matter pleaded in the answer. On the trial, over the objections of the defendant, plaintiff read in evidence the following extracts from defendant's abondoned answers:

"Defendant further states that shortly before the time of the alleged speaking of the alleged slanderous words set forth in plaintiff's petition, a lady who was a member of the family of the said J. C. Elms, and a member of a Christian Church, met this defendant and made a statement to him that the said J. C. Elms and plaintiff were living in sin.

"That defendant was acquainted with said lady last mentioned, and knew her to be sincere and truthful and interested in the matter of said charge and in causing the said Elms to lead a moral life and fully believed the statement above mentioned made by her to defendant of and concerning the said Elms and plaintiff, and had other reasonble cause to believe said statement because of remarks made by said Henry to him at the same time; and that so believing and without any malice towards or against plaintiff or said Elms, and actuated solely with a desire to comply with the rules of said society and to perform his duty as a member thereof, this defendant, in good faith, mentioned said statement was made and the name of the person by whom it was made, to said Henry as a member of said society, in compliance with the rules thereof, and for the sole purpose of having said charge made in said statement investigated in accordance with said rules."

"This defendant further denies that because of any words spoken, used or pubilshed by him of or concern-

ing plaintiff and said Elms, plaintiff was made to suffer great mental pain, or was damaged in her good name or fame, or that her reputation as a pure, virtuous or chaste woman was or is injured; or that she had suffered humiliation or disgrace thereby, or that she had been brought into contempt or ridicule, or exposed to public wrath or hatred, or deprived of the public countenance or social intercourse, or amongst her former friends or acquaintances."

"This defendant further states that shortly before the time of the alleged speaking of the alleged slanderous words set forth in plaintiff's petition, one Mrs. Blanche Ward, who was a daughter of the said J. C. Elms, and a member of a Christian Church, and a resident of said city of St. Louis, Mo., met this defendant and made a statement to him that the said J. C. Elms was at that time, living in sin at the house of said Elms and other statements tending to show that plaintiff was a participant in the sinful life of said Elms which she charged against him.

"That at a meeting of said society, held for the purpose of making said investigation, said Henry gave testimony as to certain acts of plaintiff and said Elms at the house of said Elms witnessed by him, said Henry, which tended to support said charge made against said Elms in and by said society and implicated plaintiff as participating therein with said Elms and thereupon said investigation was adjourned to another day; that this defendant was not present at said last meeting of said society and in a few days thereafter and before said investigation was resumed by said society, he met said Henry and made inquiries as to what had occurred at said meeting of said society so that he might be able to assist at said investigation at the next meeting of said society held therefor, whereupon said Henry stated to defendant what had occurred and the testimony aforesaid repeated to said Henry in connection with the statement last men-

tioned of said Henry the statement aforesaid made to defendant by said Mrs. Blanche Ward."

"Defendant files this second amended answer by leave of court and admits that at the time and place set forth in the plaintiff's petition he had a conversation with said Henry in which the defendant stated to said Henry that said Elms was living in sin at the house of said Elms and admits that plaintiff was mentioned in said conversation as having knowledge of the sinful life of said Elms.

That at a meeting of said society, held for the purpose of making said investigation said Henry gave testimony as to certain acts of plaintiff and said Elms at the house of said Elms witnessed by him, said Henry, which tended to support said charge made against said Elms in and by said society and implicated plaintiff as participating therein with said Elms and thereupon said investigation was adjourned to another day; that this defendant was not present at said last meeting of said society and in a few days thereafter and before said investigation was resumed by said society, he met said Henry and made inquiries as to what had occurred at said meeting of said society so that he might be able to assist at said investigation at the next meeting of said society held therefor, whereupon said Henry stated to defendant what had occurred and the testimony aforesaid given by him, said Henry, and thereupon this defendant repeated to said Henry in connection with the statement last mentioned of said Henry, the statement aforesaid made to defendant by said Mr. Blanch Ward.

"That shortly before the time of the alleged speaking of the alleged slanderous words set forth in plaintiff's petition, one Mrs. Blanch Ward, who was a daughter of the said J. C. Elms and a member of a Christian church and a resident of said city of St. Louis, Mo., met this defendant and made a statement to him that the said J. C. Elms was at that time living in sin at the house of said Elms and other statements tending to show that

plaintiff was a participant in the sinful life of said Elms which she charged against him."

"By way of answer to the second amended petition of plaintiff, the defendant denies each and every allegation in said petition contained."

The plaintiff testified that in March, April or May, 1901, Mr. Stuckert told her that Mr. White had said something about her to Mr. Henry; that a day or two afterwards she and her sister called on Mr. Edward Henry, and Mr. White called on her and told her, that he did not say that "Mr. Elms and I (witness) were living together in sin," that it was Mrs. Blanch Ward (a daughter of Mr. Elms) who had said it. Witness stated that the charge made her sick; that she had nervous headache, could not sleep and lost flesh; that she had previously enjoyed good health but had lost it, had nervous spells, was sick all the time and under the care of a physician and that people "would look down on her as if they believed it;" that the charge was absolutely false; that Henry had been a frequent visitor at the Elms house previous to that time, but afterwards ceased his visits entirely. On cross-examination plaintiff testified that she first went to Elms' house in Woodland to learn the hair business (Elms being in the hair business) and that his family was then composed of himself, Mrs. Blanch Ward and Mrs. Jennie Ward, his daughters, his son, James, two small children and a house girl, Amelia Carswell; that they all left but James and the children and she then took charge of the house; that Mr. Elms was sick, had nervous prostration and she put cold cloths on his head and brought him hot tea, but denied that she rubbed or "ironed" his back to relieve him of rheumatism or lumbago, and admitted that she read to him in the evening while he lay with his nightshirt on, but said the nightshirt was drawn on over his clothes and not put on after he had undressed, and that she never read to him later than nine or ten o'clock; that there were two beds in the room, one occupied by Elms and the other by his

son, James; that her readings were all from the New Testament; that she slept across the hall from Elms' room and his son put a bell in her room, with a cord that went to Elms's room, but the bell was only up two or three nights and she was never called by it; that her employment by Elms was the first she ever had, and she was receiving (at the time of the trial) the same compensation ($16 per month) from him that she had received from the first; that in the fall of 1900 no one asked her what she was doing at Elms's house or cautioned her against doing any personal service for Elms; that Mrs. Blanch Ward was there about Christmas, in 1900, and asked her if she was reading to her father at night while he was in bed and she told her she was, but did not remember what Mrs. Ward said about it.

Mrs. John S. Overton, sister of plaintiff testified that when he heard the report about plaintiff and Elms, in April or May, 1900, she and plaintiff called to see Mr. Henry twice; and after the report plaintiff was sick and nervous and lost twenty-five pounds in weight.

Plaintiff offered evidence tending to show that her reputation for good morals, chastity and virtue was good.

On the part of the defendant, the evidence shows that Elms, Henry, the defendant, White, and fifty or sixty other persons were members of a religous society known as the "Brethren," and had their place of meeting for worship on Florissant and Obear avenues in the city of St. Louis. The "Brethren" had no printed rules or discipline but took the Scriptures as their guide. So far as the evidence discloses they had no elders or other church dignitaries. A godly life is required as a prerequisite to entitle one to commune with the "Brethren," that is, to partake of the Lord's Supper. When a member is charged with sinful or immoral conduct he is notified by some brother to appear before the society and answer the charge, and if he fails to appear or to clear his skirts of the charge, the "Brethren" refuse to commune

with him and he is dropped from the society. On a pervious occasion Elms was under charges of grave suspicion by the "Brethren," with which, however, plaintiff was in no way connected. Elms wrote a very penitent letter, addressed to the "Brethren" acknowledging his sins (no particular ones) and beseeching the "Brethren" to forgive him. He was forgiven and restored to full communion. In some manner, perhaps through the complaint of his daughters and the statements of Edward Henry, though he denies making any statement to the society, suspicion was aroused in the minds of some of the "Brethren" that the conduct of Elms and the plaintiff was not what it should be, and Mesdames Ward were asked to make written charges against their father, and he was notified to appear before the society and clear his skirts. The daughters declined to make written charges against their father and he refused to appear before the society and clear up the rumors or accusations against him and was either expelled or dropped from the society. Members of the society were engaged for some time in their efforts to induce Mesdames Ward to perfer charges and in trying to get Elms to appear before the society. It was during this time and pending this attempted investigation that defendant spoke to Henry and when it is alleged he uttered the slanderous words. "Mr. Elms and Miss Kersting are living in sin together at Mr. Elms' house." Edward Henry took part in the effort to procure an explanation from Elms, as did defendant. White and Henry testified that what White said to him (Henry) at the store where he was a clerk (the store of Scruggs, Vandervoort & Barney), was that Mr. Elms' daughter, Mrs. Ward, had told him that her father was living in sin, that the name of the plaintiff was not mentioned in the conversation. On cross-examination Henry denied that he had, on a certain occasion, told the plaintiff and Mrs. Overton and one other, Mr. Holliday, that White said to him that "Mrs. Blanch Ward said that Elms and Miss

Kersting are living in sin together." In rebuttal the plaintiff, Mrs. Overton and Holliday all testified that Henry told them that defendant said to him, "Elms and Miss Kersting are living in sin together at Elms' house." Henry further testified, in substance, that from October, 1900, to about the following Christmas, he, at Elms' special solicitation, visited Elms' house a great many times; that the last time he was there his wife was with him and they remained over night and slept in a room adjoining Elms' room; that plaintiff read to Elms that night while he was in bed with his nightshirt on and that the reading continued to a very late hour; that after witnessing this scene he did not visit Elms any more. Witness testified that he did not make known what he had seen to the society of the "Brethren" but several of the members testified that he related the story to the society, and from their testimony it is at least inferable that the story, more than anything else, influenced them to refuse to hold communion with Elms.

Mrs. Blanch Ward testified that in the winter of 1901 she attended a Bible class meeting and after it was over was crossing the street when defendant accosted her and said, "What is the matter with your father;" and she replied, "Wont you go down and straighten it out for me," and remarked about having written her father a letter but that its contents were too lengthy to relate on the street and said, "But I am surprised at you, Mr. White, a member of the Brethren, whom my father meets with, that none of you have ever taken him aside and talked to him about his sinful life," but did not think plaintiff's name was mentioned; that after the conversation with Mr. White the Brethren came to her and asked what seemed to be the trouble and she told them about writing a letter; that she did not explain to Mr. White the nature of her father's sinful conduct and what she said to him had no reference to her father's sinful life in connection with plaintiff; that plaintiff told her of reading to her father at night and she said to plaintiff that she thought

she was acting very unwisely and if she valued her good name she would not continue it; that plaintiff asked her if she thought there was anything wrong in it and she told her she did; that she had heard from other people that plaintiff had rubbed or "ironed" her father's back and she told her there were men on the place who could do such things and if she valued her good name she would not continue it. The letter referred to by Mrs. Ward was not produced. She related its contents from memory as follows:

"My dear father:

Having a desire to live a godly life and that my life should be pure before God, and realizing that the least thing that comes between God and myself may hinder this purity, I want to be sure of clearing up everything in my life, and so do my sisters, among the little things we have done as children that we believe now to be wrong. I was very much surprised the other day when I read in the Bible the verse: 'Whoso robbeth his father or his mother,' and thinking it is sin, upon this ground I want to ask your pardon, or forgiveness, for anything we may have done from our childhood up."

After relating the letter as above set forth, witness stated that she had left out part, and continued as follows:

"I read in the Scriptures one day that 'whoso robbeth his father or mother, and saith it is no transgression, the same is the companion of a destroyer.' I realized upon reading this that there had been many a thing in my life from childhood up that I should confess. I also remember that I have a few of your books here in my house that I would like to return to you."

Witness stated that the letter was signed by herself and her two sisters.

Mrs. Jennie Ward testified that she and her sister were at a meeting of the Brethren in 1901, or latter part of 1900, and in speaking of her father said: "We were

very much concerned about his spiritual life and asked
them (meaning the Brethren) how it was that they
could fellowship with him in the Lord and not rebuke
him for his manner and living. We asked them if they
would not go and see him and have prayer with him
about it and that was the first occasion; sometimes we
explained to them wherein he was derelict or wanting
in his duties as a Christian." Witness remembers tell-
ing Mr. Hughes, "being that he was an old friend of the
family, and we did not care to publish the home life and
expose father's fault." Witness, continuing, stated
that she wanted her father's conduct reformed; did not
want him to be living a life that she knew was contrary
to the teachings of God's word; one was his wrath;
wanted his whole life in general reformed; tried to
shield him as much as she could; witness heard about
occurrences at her father's house during the fall of 1900
and 1901, in which it was claimed that plaintiff partici-
pated. It was just about seven months after Mrs. Elms'
death when witness heard that plaintiff was put at the
head of the table, sitting in Mrs. Elms' house; that she
would go to the door and help Mr. Elms on with his coat
and "was so very obliging, hanging around him;" that
they would sit at the table and play peek-a-boo to one
another behind the lamp; then about a bell attached to
the different rooms, and about ironing his back "and I
don't know all I did hear. Those were the main things.
We met Mr. White at the Presbyterian and West End
Coliseum, both. We were always talking about him and
about the letter sister wrote;" that her father's sinful
life was touched upon and they wanted them to come
before a public meeting and expose these different things
and they did not care to do that.

Robert Slater, a witness for defendant, testified that
he knew J. C. Elms and his daughters, the Mesdames
Ward, and his son James, and was a member of the

117 App.—38

Brethren in 1900 and 1901; the first he heard of the complaints about Elms was from Mr. White on one Lord's day, who whispered to witness privately what Mrs. Ward had stated to him, that her father was living in sin or a sinful life, "don't remember which, and at meetings in the Coliseum they stated their father was living in sin and that the Brethren ought to realize that he was not the proper person for them to have fellowship with, and chided us for not looking into his life and correcting it. The matter was spoken of at a meeting of the Brethren and the statements that had been made to Mr. White were stated at that meeting." That was after Mr. White had spoken to witness. A meeting of the Brethren was held and a committee of two of the Brethren were directed or asked to see Mr. Elms and Mrs. Ward, or Elms' daughters, and ask them to be present at the meeting at which these things could be talked over and discussed. There was nothing done because neither of them made their appearance at any meeting. The matter was considered at only two meetings of the Brethren that witness remembers, there might have been others. The Lord's day on which this was mentioned to witness, witness does not recall whether Elms was present or not at the meeting, but on next Lord's day, he appeared at the meeting, and Mr. Hughes at the suggestion of some other of the brethren advised him to sit back—not participate in the Lord's Supper, as those remarks were being circulated about him "we thought it was a wise thing for him not to do it. He never afterwards participated in the meetings. The duty of the members in such a matter is what is in the Bible. It is the duty of the member to have the matter brought before the assembly and confer with the other members about it and to tell them."

On cross-examination witness stated: "We have a right to communicate these matters to our own assembly. We get it out of the Word of God, First Corinthians, 5th chapter, 11th verse. If you read the whole Epistles

of Paul to the Church, you find different things connect-
ed. We don't go around and discuss these things. We
went to individual members that we recognized accord-
ing to the scripture—we called them elders, and talked
with them about the matter. Younger Brethren ought
not to know these things; there are older ones who
ought. There is no fixed age for this. We make no
committees. We ask certain men that we have confidence
in. Mr. Hughes and Mr. Meyer were asked to go to see
Elms. Mr. Henry, so far as I know, was not asked.
They are an assembly of Christians called Brethren by
some people."

Hughes and Meyer both testified that they went to
see Elms and tried to persuade him to go to the assembly
of the Brethren and meet the charges that were in cir-
culation against him; that he at first said he would go
but afterwards would not say whether he would go or
not, but never did go.

Defendant read the whole of his abandoned an-
swers in evidence.

Defendant, in his own behalf, testified that he had
been a member of the society of Brethren for twenty-
six or twenty-seven years; that the members "are select-
ed on their morals, if their life has been good, and on the
ground that they are sound in doctrine; they have got
communion. The Brethren are admitted to the Lord's
Supper with us. When any rumor of wrong-doing of a
brother or any actions by a brother having an appear-
ance of evil are brought to the notice of the members of
the society, it is the duty of that member or brothers
to bring it before the assembly or company of believers.
It is generally the case that we consult with those whom
we think have proper judgment in these matters. The
duty of all the members is to see and care for one an-
other, see that nothing that would bring dishonor or dis-
repute upon the company should be allowed." If a re-
port derogatory to a member came to witness's knowledge,
he believes it to be his duty on hearing these reports

to make them known to the assembly and have the matter investigated. His duty was to make it known to those whom he considered were the assembly and to those whom he considered could give wise counsel. Edward Henry and Richard Slater were members of the Brethren. Witness considered Slater a man of experience in age, and Henry was quite an active man in that meeting and had been for some time. Witness considered them very wise men and believed they were proper persons to communicate those matters to. The Brethren numbered seventy to one hundred, anyhow, there were from fifty to seventy-five in 1901. During 1900 and in 1901 James C. Elms, Mr. Myers, Edward Henry, Frank Aston and Mr. Seed were all members of the Brethren. Witness knows Mrs. Blanch Ward, and met her with a lady, Mrs. McLeod, who stepped away and didn't hear any of the conversation. Mrs. Ward said, "Mr. White, I am surprised that you people at Obear and Florissant avenues going on with my father living in sin." Witness, being asked if plaintiff's name was then mentioned, said "No;" that Mrs. Ward never mentioned plaintiff's name to him in connection with her father living in sin, or in connection with any charges against him. Witness sought to defend her father and to have a reconciliation between her and her sisters and him. He was then on friendly terms with Elms. Being asked what he said to Mr. Edward Henry about the matter, witness said that he went into the store of Mr. Vandervoort & Barney. Henry was a clerk there and came out to talk with witness. There had been a previous meeting of the Brethren or an assembly meeting at which witness wasn't present. Henry, therefore, related to witness the testimony in the matter and what he had seen that would strengthen or back up the testimony, that J. C. Elms should be investigated. Witness stated to Mr. Henry that Mrs. Blanch Ward had said she was astonished, or something similar to that word, that "we people of North St. Louis should go on with

him living in sin," that in this conversation with Henry, plaintiff's name was not mentioned, either by witness or by Henry. No other person was present. When witness made that statement to Henry he believed her statement and testimony at that time and has ever since believed it. Witness conveyed these communications to the Brethren because he thought that if these statements were so—and witness believed them to be true—that J. C. Elms should not be recognized or admitted amongst them. When witness made these communications he believed it to be his duty to do so.

The attention of defendant was called to that portion of his first abandoned answer read in evidence and was asked if he had read it or heard it read prior to hearing it read in court on a former trial. He said he did not know. His attention was then called to the portions of the other abandoned answers read in evidence and he was was asked if he had read or heard them or either of them read before hearing them read at a former trial. His answer was "No." Defendant stated on cross-examination that he denied from the first ever having made the statement to Henry charged in the petition and admitted in the abandoned answers; that he told plaintiff at the beginning he never made the statement; that he told Mr. Kinealy, his attorney, the facts and left it to him to fix up the answers and did not know what was in them. At recess the defendant had a consultation with Mr. Kinealy, his attorney, in which he said Mr. Kinealy called his attention to a fact he had forgotten and asked the privilege of correcting his statement in regard to the first abandoned answer. The court permitted him to make the correction and he testified: "I remember either reading a paragraph or of Mr. Kinealy reading it to me, and I told Mr. Kinealy that such a statement shouldn't be in there, for I never mentioned the young woman's name and I remember that distinctly, but all the other documents I never saw."

Mr. Kinealy testified that he was an attorney-at-law and an attorney of record for Mr. White; when Mr. White came to employ him in this case, he brought with him two other gentlemen, maybe three; his recollection is that Mr. Slater was with him or Mr. Hughes, or some of these parties.   Mr. White said he was sued, thinks he had the petition with him.   Witness looked over the petition, asked him a few questions about it, asked him about the facts of the case, but did not get very much of an explanation from Mr. White, except the fact that it arose in a church dispute.   After Mr. White went away, Mr. Hughes and Mr. Slater came several times to witness's office and witness questioned them about the particulars and in the course of the discussion got the impression from them—objection being made, witness continued—that he based his answer upon what those two gentlemen told him because they showed themselves to be thoroughly informed on these church matters and had been a little more apt in stating the information than Mr. White, as witness judged; witness then drew the general denial and a matter of privilege.   A motion to elect was made; while that motion was pending Mr. White came in to see witness in regard to the matter, and witness told him the contents of the answer and read it to him.   He immediately protested that that was not true; that he never mentioned this woman's name and didn't want anything of the kind to be put in.   Witness did not appear on the motion because he understood—had heard from his son—that under the ruling of the court his idea was that the answer could not stand, that he could not plead a general denial and the privilege; witness's understanding of the ruling was that he had to make some admission of some kind or another in order to hang the privilege on; that being so, he talked again with Mr. Hughes and Mr. Slater, asked them more about the particulars of the case and drew the second answer so that, if possible, to lay a foundation by some kind of an admission that would bring in or permit un-

der the ruling of this court, as he understood it, witness to plead privilege. He wanted to draw an answer making so much admission of the speaking of the words as would give him an opportunity to plead privilege when these answers were drawn and Mr. White was not consulted about the matter; it is not witness's practice to consult his clients in regard to pleadings. At the recess this day witness suggested to Mr. White—here objection was made and sustained. Witness did not testify at any former trial of this case.

The three abandoned answers read in evidence by defendant are substantially alike; the second one, omitting caption, was copied in full in the statement of the case of the former appeal and will be found on pages, 271, 272, 273, 274 and 275, 107 Mo. App.

In rebuttal plaintiff stated that she never "ironed" or rubbed Elms' back and never played peek-a-boo with him.

The court gave the following instructions to the jury:

"1. If you believe and find from the evidence, that the defendant, Robert White, spoke of and concerning the plaintiff, to one Edward Henry, the words charged in the petition: 'Mr. Elms and Miss Kersting are living in sin together at Elms' house,' or substantially the same words, having the same meaning and affect; and that said words, in the sense in which they were understood between the said Robert White and Edward Henry, meant that the plaintiff was guilty of fornication; and if you do not further believe and find from the evidence, that said words were so spoken under such circumstances as to make them a privileged communication, under other instructions herein, then you should find that said words were spoken maliciously and with intent to defame the plaintiff, and in such case should find a verdict for the plaintiff.

"2. If you believe and find from the evidence that the defendant, Robert White, spoke of and concerning

the plaintiff the words charged in the petition: 'Mr. Elms and Miss Kersting are living in sin together at Elms' house,' or substantially the same words, having the same meaning and effect, meaning thereby to charge the plaintiff with fornication and being so understood by said Henry; then the court instructs you that said words under the pleadings in this case should be taken as untrue, and are slanderous, unless you further believe and find from the evidence that said words were so spoken under such circumstances as to constitute a privileged communication, under the instructions as to privileged communication.

"3. Unless the jury believe from the evidence that defendant told Edward Henry that plaintiff was living in sin with J. C. Elms at the house of Elms, or words to that effect they will find for the defendant.

"4. The court instructs the jury that if J. C. Elms and defendant and Edward Henry were members of an association which required its members to lead a moral life and desired only to retain members leading such a life in its membership; that charges of immoral conduct or immoral living or immoral acts on the part of said Elms were made to or heard by some of the members of said society including defendant and thereupon preliminary inquiries were instituted by some of said members for the purpose of ascertaining the facts with a view of having said charges investigated by the society; that defendant as one of such members repeated to said Henry in good faith for the purpose of aiding such investigation and in the belief that it was his duty to do so, a charge made against or concerning said Elms by a reputable person which charge was by defendant then believed to be true and that said charge consisted of the alleged slanderous words claimed by plaintiff to have been spoken by defendant to said Henry then defendant is entitled to a verdict in this action, notwithstanding the fact that plaintiff was indicated as being a participant in the acts

of Elms complained of and was innocent thereof and was not a member of said association.

"5. If you should believe and find from the evidence that said words complained of were spoken by the defendant under the circumstances as set forth in the preceding instruction number 4, then such circumstances would in law constitute an occasion of privilege, and the words so spoken upon such occasion, that is, under such circumstances, would be a privileged communication, and not malicious or slanderous.

"6. The court instructs the jury that if they find that defendant was one of the Brethren mentioned in the evidence on this trial, a repetition by him to another of said Brethren of the statements made by him, defendant, to Edward Henry if made to such one of said Brethren in good faith, with the purpose to impart to him such information with a view to investigation of the conduct of another of said Brethren and under an honest belief that said statement was true and that making such statement to said one of said Brethren was a duty incumbent on defendant, or if such statement was of a matter in which defendant was interested as one of such Brethren under their rules of conduct and duty then such repetition cannot be considered by the jury as showing any actual malice of defendant in making said statement to said Henry.

"7. The court instructs the jury that if you believe from the evidence and admissions in this case that defendant spoke the alleged slanderous words, as set out in the petition, then the fact, if proved, that the defendant gave the statement, as being a report in the neighborhood, or as having come from another party, and even though he mentions the name of the other party, still these facts do not alone exonerate him from liability.

"8. The previous answers in this cause, signed by defendant's attorneys, and read in evidence, are to be considered by you as evidence in this case. You

should consider that the statements in each of said answers in connection with the other statements therein, considering all the statements of each answer together, and also considering the circumstances under which they were made. The defendant is entitled to the benefit of what, if anything, was stated in said answer in his favor, and the plaintiff to what was so stated, if anything in her favor. What was stated against the defendant, if anything, the law presumes to be true, because stated against himself but such presumption is not conclusive but is subject to explanation by consideration of the circumstances under which said statements were made. What was so stated, in his favor, you are not bound to believe merely because it was stated in one of said answers. But you should consider all the statements made in said answers, in connection with all the evidence, and give to each statement such weight and credit as you believe the same entitled to.

"9. The court instructs the jury that the statement of Edward Henry to witnesses Halliday, Mrs. John S. Overton and Miss Kersting cannot be considered as any evidence against defendant in this case; but should be considered by the jury solely on the question as to what credit or weight to give the testimony of said Edward Henry as a witness in this case.

"10. The court instructs the jury that no repetition by defendant to any third person of what he stated to defendant Henry, if defendant made any such statement to any third person, can be considered in estimating damages in case the jury were to find for plaintiff.

"11. The court instructs the jury that, if you find for the plaintiff, in arriving at the damages you may take into consideration her mental anguish, if any, wounded feelings, if any, wounded pride, if any, in addition to injury to her character and reputation, if any, which you may believe she has suffered as a result of the speaking of the words complained of.

"12. The court instructs the jury that the plaintiff

cannot recover in this action any punitive damages or damages by way of smart money or to punish this defendant, and if the jury should find for plaintiff in this action they cannot award her any damages save such as are compensation for injuries suffered by her as the natural and necessary result of the speaking by defendant to Edward Henry of the alleged slanderous words set forth in the petition as having been spoken by defendant to Edward Henry.

The jury returned a verdict for plaintiff for two thousand dollars. Defendant filed a timely motion for new trial which the court overruled, and defendant appealed.

BLAND, P. J. (after stating the facts).—1. Defendant contends that the uncontradicted evidence shows the communication from defendant to Henry was privileged and for this reason the judgment should be reversed. The slanderous words alleged in the petition to have been spoken by defendant to Henry was not admitted in the answer on which the case was tried. The pleader studiously avoided the admission made in the abandoned answers and indirectly denied that defendant uttered the slanderous words, or substantially the same words, by alleging a conversation with Henry in which no slanderous words were spoken about plaintiff. But in other portions of the answer it is stated in substance, that Elms' son and daughters accused their father of living in sin, and by a narrative of facts it is insinuated that plaintiff participated in Elms' sin. If defendant did not speak and publish the slanderous words charged in the petition, we are unable to see why he should or how he can claim, as privileged, the speaking of words he never uttered. But the case was tried on the theory that defendant was entitled, under his answer, to show that his communication to Henry was privileged. On the former appeal, in discussing this feature of the case, at page 277, 107 Mo. App., we said:

"In Finley v. Steele, 159 Mo. 1. c. 305, 60 S. W. 108, the Supreme Court adopted the following quotations as correctly defining qualifiedly privileged communications:

"In Byam v. Collins, 111 N. Y. 143, it is said: 'A libelous communication is regarded as privileged, if made bona fide, upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty, if made to a person having a corresponding interest or duty, although it contains criminating matter which, without this privilege, would be slanderous and actionable; and this, though the duty be not a legal one; but only a moral or social duty of imperfect obligation.' "

Mesdames Ward and defendant himself testified that in the conversation had between them, in respect to Elms living in sin, the plaintiff's name was not mentioned, and the evidence of the women is that not only was plaintiff's name not mentioned but the subject-matter of the conversation had no reference to her. The defendant also testified that he got the information he communicated to Henry from Mrs. Blanch Ward, therefore, if he spoke the slanderous words, alleged in the petition, to Henry, he spoke an untruth and could not have acted in good faith; for this reason if no other, we cannot say, as a matter of law, this communication was privileged. The issue of privilege or no privilege, we think, was submitted to the jury by fair and correct instructions, to the granting of which the defendant made no complaint.

2. The principal error complained of is the giving of the eighth instruction, in respect to the probative force and effect of the abandoned answers read in evidence.

In Dowzelot v. Rawlings, 58 Mo. 1. c. 77, the Supreme Court, through SHERWOOD, J., said:

"It was perfectly competent for plaintiffs to offer in evidence the petition which the attorney of Rawlings, at the latter's instance, had filed in the suit against Pen-

nison; and this wholly regardless of the question, whether Rawlings had ever seen the petition after it was drawn up, or not.

The act of the attorney was the act of the defendant, and any admissions contained in the petition, could be received against, and be binding upon him. 'Thus where a carrier brought trover against a person, to whom he had delivered the goods intrusted to him, and which were lost, the record in this suit was held admissible for the owner, in a subsequent action brought by him against the carrier, as amounting to a confession in a court of record, that he had the plaintiff's goods.' [1 Greenlf. Ev., secs. 195, 527.]"

The above case is approvingly cited in Anderson v. McPike, 86 Mo. l. c. 301. But in that case the probative force of the admission in the answer offered in evidence was overthrown for the reason the attorney who filed it swore he had not been employed by the defendant.

In Walser v. Wear, 141 Mo. l. c. 464, 42 S. W. 928, it is said: "The rule of this State seems to be that such pleadings (abandoned answers) are admissible in evidence when they contain admissions or statements of facts aginst the interest of the party in whose pleadings they appear."

Weeks on Attorneys at Law (2 Ed.), p. 461, says, that an attorney may admit the facts on the trial or in the pleading by which his client will be bound is not questioned, and is the law.

ELLIOTT, J., in Boots v. Canine, 94 Ind. 408, 412, said: "Our statute has adopted the equity practice, we try pleadings as statutory facts, not fictions. . . . If it can be said that courts can presume that an answer under our Code does not state facts then it may be logically said that it is no evidence, but if the presumption is that it does state facts, then it is logically inconceivable that it should not be evidence against the party. . . . It is simply absurd to say that under our Code the statements in the pleadings are mere fiction and if

they are not fictions then they are facts and if facts in some cases and in others conclusive admissions of record then they are evidence. An admission in a pleading is the admission of matters of fact; this seems so plain that it is difficult to understand how the contrary doctrine can be seriously asserted." Our Code is like that of Indiana, and we think the reasoning of Judge ELLIOT is unanswerable.

Professor Wigmore says: "When a pleading is amended or withdrawn, the superseded portion disappears from the record as a judicial admission limiting the issues and putting certain facts beyond dispute. Nevertheless, it exists as an utterance once seriously made by the party. While thus denied all further effect as a pleading, may it not still be used as a quasi-admission, like any other utterance of the party?" The author then states the objections to the use of an abandoned pleading as evidence and answers them as follows: "So far as the argument from hurry and inadvertence is concerned, it would be equally valid against many extra-judicial utterances of the party. Yet no one has ever supposed that it afforded any reason for their rejection. The party is always at liberty to show the circumstances in explanation, to detract from the significance of his utterance. The other argument—that of the unfairness of allowing comment in argument, after the evidence closed—rests on incorrect premises, for the conceded rule (noted later) is that the superseded pleading, when thus used, must always be formally offered in evidence at the proper time, like all other matters of evidence. There is no reason why a retraction, based (perhaps) on better information, should affect the exclusion of this rather than of any other sort of statement, once made by the party and now offered against him:

"ELLIOT, J., in Boots v. Canine, 94 Ind. 408, 416: 'We should feel that were doing an idle thing if we should undertake to cite authority upon the proposition that a party canot be deprived of his right to give in evi-

dence an admission because the latter had withdrawn it. Even in criminal cases, an admission made by the accused before the examining magistrate is not rendered incompetent by a subsequent withdrawal. The withdrawal of an admission may, in proper cases, go in explanation, but it cannot change the rule as to its competency. We have never, until the argument in this case, known it to be asserted that the withdrawal of a confession or an admission destroyed its competency as evidence against the person making it. If it did, then criminals might destroy evidence by retraction, and parties escape admissions by a like course. The law tolerates no such illogical procedure. It is proper to show the withdrawal and all attendant circumstances, for the purpose of determining the weight to be attached to the admission, but not for the purpose of destroying its competency.'

"Such is the view generally accepted, although the rulings are by no means uniform." [2 Wigmore on Evidence, sec. 1067.]

In Trask v. Ins. Co., 58 Mo. App. 1. c. 439, it is said that an admission arising out of an abandoned pleading, though admissible in evidence under our practice, furnishes the weakest kind of evidence and is subject to rebuttal. It seems to us that whether or not such an admission is weak or strong evidence, depends largely upon the nature and character of the fact admitted, the number of times it was repeated, its materiality to the issues in the case and the knowledge or want of knowledge of the party making the admission of the fact admitted; and that it is the province of the jury, not of the court, to declare what weight should be given the admission. The admissions read in evidence by the plaintiff from defendant's answers prima facie admitted plaintiff's cause of action. The evidence to rebut these admissions was not conclusive, and we think instruction No. 8 furnished the jury a correct guide by which to determine what weight, if any, should be given the admissions.

3.   Defendant offered to prove that reports in and around Woodland (where Elms resided) were unfavorable to Elms and plaintiff, in respect to their relations to each other, and that these reports were current before the investigation of Elms' conduct was started by the society of Brethren, and before the speaking of the alleged slanderous words by defendant to Henry. The exclusion of this character of evidence is assigned as error. Current rumor in Elms' home town, unfavorable to his Christian character, might perhaps have justified the society of Brethren of which he was a member to have inquired concerning the rumors, but it does not appear from the evidence that the Brethren were stimulated to action by current rumors but were moved to take action by the accusations of persons who professed to speak from knowledge and not from rumor, and as the society was not on trial the good faith of its actions is not a question at issue in the case. If the purpose of the evidence was to bolster up the other insinuating evidence of defendant, tending to raise a suspicion that the relations between Elms and plaintiff was meretricious, then it was not admissible. Current rumor is not infrequently a gross prevaricator; it is lower in the scale of evidence than mere hearsay; it is so low in the scale of human estimation that no one will father it, and surely a court of justice should not give it recognition as evidence tending to show obliquity of moral character.

4.   The defendant has presented in the bill of exceptions and had printed in his abstract, the address of L. P. Crigler, plaintiff's counsel, to the jury and makes many criticisms of the speech. Mr. Crigler used this language: "I say that if this man Henry told three or four people that White told him that Miss Kersting and Mr. Elms were living in sin together at Elms' house, we have four people to contradict Mr. White when he says he did not say it." This was objected to. The court said that it was not proper and Mr. Crigler immediately corrected his statement by saying he called the name of

White when he should, and intended, to call the name of Henry. The slip of Crigler's tongue was corrected on the spot and could have done no harm. Besides the court, in instruction No. 9, specifically told the jury that the statements of the witness Henry to Holliday and the other impeaching witnesses, could not be considered as evidence against the defendant, but only went to the credibility of the witness Henry. We have discovered nothing else in the speech that warrants criticism; it is a little bit warm, but no more so than such addresses usually are in a hotly contested lawsuit, as was this one.

5. It is finally insisted that the damages are excessive and show that the jury were influenced by prejudice and passion. The verdict in this case is not so large as to shock our understanding or impress us with a conviction that the jury were prejudiced or influenced by passion. In view of the pleadings, we think the case was conducted with liberality toward the defendant and that no prejudicial error against him intervened.

The judgment is therefore affirmed. All concur.