JOSEPHINE S. FISHER v. JOSEPHINE MYERS ET AL., Appellants.—100 S. W. (2d) 551.

Division one, December 14, 1936.

*Clif Langsdale* for appellants.

*Burns & White* for respondent.

FERGUSON, C.—This action for libel was commenced and tried in the Circuit Court of Jackson County, at Independence. Josephine Myers, Okie Myers, John W. Truesdale, John P. Austin, W. W.

Grow, C. L. Stange, John H. McGuire and Edith E. Ambruster, were made defendants. The verdict of the jury was against all the defendants for $50,000 actual and $75,000 punitive damages. The defendants filed separate motions for a new trial; the motion of defendant Ambruster was sustained and the other motions overruled. Whereupon the plaintiff dismissed as to defendant Ambruster and from the judgment entered against them in the aggregate amount of $125,000, in accordance with the verdict, the other defendants have appealed.

Eleven days were consumed in the trial of this case; the record is voluminous and it is with misgiving the writer undertakes to state even in general outline the facts developed by the testimony of the large number of witnesses. However appellant's assignments of error on this appeal necessitate such a statement. The plaintiff, Mrs. Josephine S. Fisher was fifty-six years of age at the time she commenced this action. Plaintiff and R. E. Fisher were married at Kansas City, Missouri, in October, 1903, and since have continuously resided together in that city as husband and wife. In 1905 the Fishers purchased "a little cottage on Montgall" in Kansas City where they made their home until 1910 when they purchased a residence on East Fifty-ninth Street where they have since resided. No children were born of the marriage. About March, 1907, Mrs. Fisher organized classes in vocal music at Sweet Springs, in Saline County, and Aullville, Lafayette County, Missouri. The members of the vocal classes were of both sexes and of various ages, "both men and women, young folks, girls and boys." The class at Sweet Springs had "somewhere between 15 and 20" members; that at Aullville eight or ten. Mrs. Fisher met the Sweet Springs class at the home of Mrs. Willis Smith and the Aullville class at the home of Mode Anson. Each week she would leave Kansas City on Thursday via of the "Lexington Branch" of the Missouri Pacific Railroad and "if the train was on time I would stop at Aullville and give my class at Aullville Thursday night and go up to Sweet Springs the next morning, Friday" (on the Lexington Branch). She would "teach at Sweet Springs all day and Friday evening" and return to Kansas City on the "Saturday morning" train. However, if the train was late on Thursday (as her testimony indicates was a frequent occurrence) she would not stop at Aullville for the Thursday night classes but continue to Sweet Springs meet her class there on Friday and Friday evening and "come back to Aullville on the Saturday morning train and give my classes there" on Saturday. She accepted frequent invitations to remain over and sing on Sunday in the churches at Sweet Springs. When returning to Kansas City on the afternoon or evening train of the Lexington Branch she would, when she leared from the trainmen that a train with which the Lexington

Branch made connection at Myrick was late, get off the Lexington Branch train at Higginsville and take a Chicago & Alton train to Kansas City and she frequently made this change at Higginsville. If, on such occasions, she had time she ate dinner at the Arcade Hotel, at Higginsville, which was across the street from the Chicago & Alton depot. It was her custom at such times to wait in the lobby of the Arcade Hotel for the Chicago & Alton train. Mrs. Fisher continued to teach these classes throughout 1907 and in 1908. Both Mr. and Mrs. Fisher testify positively that she made her last trip and met the Sweet Springs and Aullville classes the last time in August, 1908; that on that trip she gave up the classes; that she left Kansas City on Thursday, August 27; that the following day was her thirty-fifth birthday and Mr. Fisher went to the depot with her and as she was getting on the train gave her a ''leather dressing case'' with her ''name on it'' and the year 1908 ''in gold letters'' as a birthday gift; that she decided to quit her classes at Sweet Springs and Aullville because the railroad fare had been greatly increased and she had failed to get a class at Slater, Missouri, which would have made it profitable for her to continue her classes at Sweet Springs and Aullville in conjunction with the proposed Slater class; that it was understood when she left Kansas City on Thursday, August 27, that Mr. Fisher would meet her at Higginsville on Sunday morning August 30 (1908); that Mr. Fisher, who was at that time secretary of the Brotherhood of Railway Mail Clerks left Kansas City for St. Louis Thursday night, in connection with business of the organization; that Mrs. Fisher having completed her work at Sweet Springs and Aullville came to Higginsville ''on the evening train'' Saturday (August 29), registered at the Arcade Hotel and spent the night there; that Mr. Fisher took a Chicago & Alton train out of St. Louis Saturday night and arrived in Higginsville at ''six or seven o'clock'' Sunday morning, August 30 (1908); and that he went to his wife's room, awakened her and ate breakfast at the hotel and took the next train for Kansas City. Mrs. Fisher says she never thereafter returned to Sweet Springs or Aullville with the exception that ''sometime in November, 1908,'' Mr. Fisher's father, who resided on a farm ''about 4½ miles'' from Sweet Springs, being ill she went there with Mr. Fisher to visit his father. Mr. Fisher stated that he was never in Higginsville after August 30, 1908, when he met his wife there as he returned from St. Louis. Mrs. Fisher testified that the only time she ever occupied a room or spent a night at the Arcade Hotel in Higginsville was the night of August 29, 1908, under the circumstances above stated, and that she was never in Higginsville after that time.

Mrs. Fisher had become a member of one of the Kansas City chapters of the Order of the Eastern Star in 1906. After 1908 Mrs. Fisher became very interested and active in the work of the Order.

She served in various offices in the Kansas City chapters of which she was a member and became and served as the first Worthy Matron of Park Chapter in 1912 and 1913. From and after 1912 she regularly attended the annual meeting of the Grand Chapter of Missouri held annually in October. She served on various committees of the Grand Chapter prior to 1918 and in that year was appointed Grand Warden of the Grand Chapter. During the ensuing years she served in the various offices "in the line" until she became Associate Grand Matron for the term from October, 1921, to October, 1922, and at the meeting of the Grand Chapter in October, 1922, she was elected Worthy Grand Matron. At the expiration of her term in that office, and at the meeting of the Grand Chapter, in October, 1923, she was elected a member of the Advisory Board of the Masonic Home for a term of three years. The Eastern Star has three members on this board. Defendant Ambruster had been elected to this Advisory Board in 1920 and that term expired in 1923. Mrs. Ambruster was thus defeated in 1923 for re-election by Mrs. Fisher who was re-elected to the board for another three-year term in 1926. After her service as Grand Matron, Mrs. Fisher served three terms as a member, of the Jurisprudence Committee of the Grand Chapter. She was active and influential within the organization and seems to have been a recognized authority on Eastern Star law and procedure. She conducted classes on "parlimentary law" and training classes for Associate Matrons in Kansas City. For seventeen years she was president of the "Parlimentary Club" of Kansas City. An impressive array of witnesses, ministers, business men and women, neighbors, officials and members of the Eastern Star, in Kansas City, who had been acquainted with Mrs. Fisher for varying periods of from twelve to twenty-eight years, stated that at all times prior to the publication in 1928 of the alleged libelous matter which is the basis of this action she bore a good reputation for morality and chastity. Both plaintiff and her husband testified that their marital life had been happy, congenial and unbroken. Such was Mrs. Fisher's position, standing and reputation when the annual meeting of the Missouri Grand Chapter of the Eastern Star convened at St. Joseph on October 9, 1928. On the morning of the first day and at the first session of the Grand Chapter a printed pamphlet of twenty-seven pages, under the title (appearing on the front cover) "READ AND BE CONVINCED," was widely distributed and the distribution thereof continued throughout the three days of the Grand Chapter meeting.

We shall not here copy the entire pamphlet but endeavor to set out the more pertinent parts and in doing so accuracy requires that we make numerous quotations. The preface on page 1 states: "The following newspaper article, affidavits, statements and letters are bona fide copies of the originals and are submitted to you for your

1202

careful consideration, in the interest of peace and harmony, and for the general welfare of the Order." The newspaper article referred to appears on page 1 and is a news item appearing in the "Higginsville Jeffersonian," a weekly newspaper published at Higginsville, of date of September 25, 1908. The item bears a headline, "Caught with the Goods" and then reads as follows:

"Judge J. E. Rigg, police judge and justice of the peace, had a case early Monday morning of more than ordinary importance. It was a case of a man with another man's wife, stopping at the Arcade Hotel. The couple came to the hotel Saturday evening and registered as man and wife. They were given a room as other guests.

"All went merry as a wedding bell until Sunday night when a gentleman arrived in town from Kansas City and informed the officers that the woman was his wife and that the man was an imposter.

"Constable Truesdale and Judge Rigg were brought into the game. A warrant was sworn out and Constable Truesdale served the warrant at the breakfast table Monday morning. At the police station the woman gave the name of Josephine Fisher. They were fined $15.00 each and costs amounting in the aggregate to a little less than $50.00, which the woman paid.

"The hotel register shows the name of 'C. C. Ellis and wife.' Ehler is said to live at Sweet Springs. A further report is that the woman has a music class at that place.

"The Fishers have been married about five years and have some property in Kansas City. The detective who worked up the case is named Small and formerly operated a livery barn at Blackburn." A joint affidavit, under date of August 10, 1928, by the then owner and publisher of the Higginsville Jeffersonian and a photographer who made a photostatic copy of the article entitled "Caught with the Goods," appearing in the issue of the paper of date of September 25, 1908, is set out certifying that the copy reproduced in the pamphlet "is a true and correct photograph of the original article." On page 3 is a purported "copy of the court record of Justice J. E. Rigg, of Higginsville, Missouri." This is presented as a certified copy or transcript of the record of the justice of peace named. The title of the case is set out as State of Missouri v. John Doe and Jennie Doe. This purported record recites:

"Defendants are charged with cohabiting as man and wife Sept. 21st, 1908.

"This day comes R. E. Fisher and files his affidavit and complaint under oath charging the defendants, John Doe and Jennie Doe with registering at the Arcade Hotel, in Higginsville as man and wife, and not being legally married. Same day issued a warrant for the arrest of the said defendants, John Doe and Jennie Doe, and placed it in the hands of John Truesdale, constable of Davis Township, returnable forthwith." It is then stated that on September 21, 1908,

the constable (Truesdale, one of the defendants herein) "returns said warrant by arresting the said defendants John Doe and Jennie Doe;" that "the defendants being arraigned and present in person and having seen and heard read the complaint, plead guilty as charged;" that "the Prosecuting Attorney, N. M. Houx, having information alleging the above facts as stated in complaint, I do assess the punishment at a fine of fifteen dollars each;" that costs amount to $18.30; and that said defendants having "paid said fine and costs were by me discharged. Given under my hand this 22nd day of September, 1908, J. E. Rigg, J. P." The following certificate to the purported copy of the record follows: "I do hereby certify that the foregoing is a true copy from my docket and that the said John Doe was C. C. Ehlers and that the said Jennie Doe was Mrs. Josephine Fisher. Given under my hand this 27th day of October, 1908. (Signed) J. E. Rigg, Justice of the Peace." This is followed by the certificate of one W. C. Pelot as justice of the peace (at Sweet Springs in Saline County) "that the foregoing represents true copies of docket transcript and certificate of J. E. Rigg, a Justice of Lafayette County," etc., "taken from the original transcript and certificate now in my keeping." This last certificate is dated April 10, 1928.

We digress here to observe that the evidence is that in 1907 and 1908 one C. C. Ehlers was a resident of Sweet Springs, a single man, of about the age of twenty-five years, engaged in the practice of dentistry at Sweet Springs, a member of the class in vocal music which the plaintiff Josephine S. Fisher conducted at Sweet Springs in 1907 and 1908, and a member of Barbee Lodge, No. 217, A. F. & A. M. at Sweet Springs. Following the publication of the news item entitled "Caught with the Goods" in the Higginsville Jeffersonian on September 25, 1908, John H. McGuire (one of the defendants), who was at the time "Junior Steward of Barbee Lodge," and Miles F. Prigmore, "a Past Master" of that lodge, went to Higginsville (in Lafayette County), viewed the record of Justice Rigg relating to the case of State of Missouri against John Doe and Jennie Doe, and made a copy thereof which was certified to by Justice Rigg under date of October 27, 1908. The justice of the peace added to the certificate the statement: "The said John Doe was C. C. Ehlers and the said Jennie Doe was Mrs. Josephine Fisher." This certified copy of the record of Justice Rigg was returned to the Barbee Lodge at Sweet Springs and introduced in evidence at the trial of Ehlers in the lodge on a charge of "un-Masonic conduct" in that "on or about the 20th day of September, 1908, at the town of Higginsville, in Lafayette County, Missouri," he "did have illicit carnal intercourse with a brother Master Mason's wife," etc. Though duly summoned or notified Ehlers did not appear at the lodge trial which was held on November 5, 1908, and Ehlers was found guilty

as charged and expelled. This copy of the docket entry of Justice Rigg so certified by him remained in the files and records of Barbee Lodge. Defendants were unable to find and produce the original record and having offered evidence that it was lost or destroyed put in evidence this certified copy thereof obtained from Barbee Lodge by *subpoena duces tecum* upon W. C. Pelot, the secretary of the lodge. Pelot was also a notary public and justice of the peace at Sweet Springs. As a justice of peace he certified that the copy of the justice peace court record and the certificate of the justice thereto as printed in the pamphlet was correct, as shown above.

We return now to the contents of the pamphlet. On page 4 is an affidavit with this heading, "Affidavit of the arresting officer." Then follows an affidavit of defendant Truesdale, who in 1908 was constable at Higginsville, which contains among other statements: that an R. E. Fisher came to Higginsville about September 20, 1908; that Fisher swore to the complaint mentioned before Justice Rigg; that he (Truesdale) "insisted that R. E. Fisher use his wife's name in the complaint instead of the name of Jennie Doe but he declined to do so;" that it being ascertained that a woman answering the description which Fisher gave of his wife was then registered, and occupying a room, at the Arcade Hotel with a man, as husband and wife, "R. E. Fisher then told this affiant not to arrest them until morning but let them stay in their room till morning." This affidavit is dated May 10, 1928. At pages 5 and 6 of the pamphlet are the separate affidavits of defendant McGuire and Miles F. Prigmore, dated respectively April 15, 1928, and May 12, 1928. These affidavits recite certain events above mentioned, that they as members and officers of Barbee Lodge at Sweet Springs went to Higginsville, viewed the record in the justice of the peace court in the case of State of Missouri v. John Doe and Jennie Doe, and obtained a certified copy thereof from Justice of Peace Rigg on October 27, 1908, etc. Each affidavit contains the further statement that "Judge J. E. Rigg specifically advised deponent that the John Doe charged in said complaint was Charles C. Ehlers and that the said Jennie Doe charged in said complaint was Mrs. Josephine Fisher." At page 7 is the joint affidavit of defendant McGuire and one M. D. Jackson, sworn to before W. C. Pelot, as notary public, on April 15, 1928. Affiants state that as members, at the time, of Barbee Lodge (at Sweet Springs) they were present "at a regular meeting" of the lodge on "October 9, 1908" when the charge of "un-Masonic conduct" (which is set out) was preferred by the Junior Warden against Charles C. Ehlers; and that they were present "at a Masonic trial . . . November 5, 1908, at which trial the said Charles C. Ehlers was found guilty of un-Masonic conduct in the form and manner charged" and "expelled from membership in said Barbee Lodge." Page 8 is a copy of the proceedings had in the Barbee Lodge in the

trial and expulsion therefrom of Ehlers. This copy is certified to by W. C. Pelot, secretary, and under the seal, of the Barbee Lodge. The general language of the charge, that is, "un-Masonic conduct in having had illicit carnal intercourse with a Master Mason's wife,'" is followed by the allegation that such occurred "on the 21st day of September, 1908, at the Arcade Hotel, in Higginsville, Mo.," and "that said Charles C. Ehlers and Mrs. Josephine Fisher were arrested on a John Doe and Jennie Doe warrant at Higginsville on that date, charged with cohabiting unlawfully as man and wife, plead guilty in open court and were fined," etc. At page 9 of the pamphlet is another affidavit by defendant, Truesdale made on September 3, 1928. He states therein that on that date he saw and identified "one R. E. Fisher, who was cutting grass and weeds in the yard at 4111 East 59th Street, Kansas City" (the residence of plaintiff and her husband, R. E. Fisher); and that "the said R. E. Fisher is the one and same person that came to Higginsville . . . . September 21, 1908," and caused the arrest of his wife and "one C. C. Ehlers" on a charge of unlawful cohabitation. The next affidavit by one Nancy Smith Thornton set out at page 10 is a positive statement without any source of her information or basis of her purported knowledge given. The affidavit is under date of September 19, 1928, and states that at that time she was employed as a "bookkeeper" in Kansas City; and that: "I have been a resident of Sweet Springs. . . . I was solicited to take vocal music from one Josephine S. Fisher, who was giving music lessons in Sweet Springs, Missouri, at that time. That the said Josephine S. Fisher was arrested in Higginsville, Lafayette County, Missouri, on a charge of cohabiting as man and wife. That the man jointly charged with the said Josephine S. Fisher was one Charles C. Ehlers, then a resident of Sweet Springs, Missouri. That the said Josephine S. Fisher is the one and same Josephine S. Fisher now residing at 4111 East 59th Street, Kansas City, Missouri; and prominent in Eastern Star circles.'' The writer digresses here to observe that defendants did not call this affiant as a witness. At page 11 of the pamphlet is the affidavit of Eva Anson Phillips, under date of September 10, 1928. Therein she states; that in the year 1908 she took "instruction in voice from one Josephine S. Fisher" at the home of her parents (Mr. and Mrs. Mode Anson) in Aullville; and that Mrs. Fisher "did not appear in Aullville to instruct her class on or after September 25, 1908." Then follows a statement of matter to which this witness was not permitted to testify when called as a witness by defendant being based wholly upon hearsay. But as published the affidavit states, that "the said Josephine S. Fisher" from whom she took vocal lessons "is one and the same" woman who was arrested at Higginsville, etc. On the same page of the pamphlet is the affidavit of Marion L. Anson, a brother of the next preceding affiant. This

affidavit was made on the same date (September 10, 1928) and at the same time. The affiant states that "on or about September 21, 1908," he "did haul and transport one Josephine S. Fisher" who "had a class and taught voice in my parent's home (at Aullville) from Aullville to Higginsville." The affidavit also states that "this is one and same Josephine S. Fisher who was arrested by John Truesdale, constable," etc. This affiant was not called as a witness by defendants.

Pages 12 to 17, both inclusive, of the pamphlet are a series of six letters bearing various dates from January 14, 1928, to August 24, 1928, written upon Grand Chapter stationery, "Office of Grand Secretary," to "Dear Josephine" and signed "Genevieve." These letters were written to Mrs. Fisher by Mrs. Genevieve F. Wyatt, of St. Louis, who was Grand Secretary of the Order of Eastern Star in 1928 and had served continuously in that office since 1912. The pamphlet identified the writer of the letters. On pages 18 to 22, both inclusive, appear five letters to "Dearest Josephine" and signed "Adele." These letters were written to Mrs. Fisher by her friend Mrs. Adele A. Wissmath, of St. Louis, a Past Grand Matron. On pages 23 to 26, both inclusive, are four letters bearing dates June 13, 1928, to August 26, 1928, to "My dear Josephine" and signed "Alta." These were letters written to Mrs. Fisher by a Mrs. Alta L. Tate, of Jefferson City. On the last page (27) is a letter on stationery of the Grand Chapter, "Office of Grand Matron, Kirksville, Mo.," dated May 3, 1928, to "My dear Mrs. Fisher" and signed "Georgia S. Bondurant," who was the Grand Matron at that time. All of these letters had been received by Mrs. Fisher through the mail and thereafter "stolen", by some unknown person or persons from her desk in her home in Kansas City. The letters were of a purely personal nature and touch upon many subjects and things; such as housekeeping, babies, children, the health of members of the family, Eastern Star meetings, picnics and social gatherings, and Eastern Star events and news generally. In the letters written by Mrs. Wyatt and Mrs. Wissmath references are found to defendants Mrs. Ambruster and Mrs. Myers and others indicating that factions and political cliques existed in the Grand Chapter. Some few caustic personal references to Mrs. Ambruster and Mrs. Myers also appear. The defendant Mrs. Josephine Myers is referred to as "Aggie Meyers"—the name Aggie usually being inclosed in quotation marks. The pamphlet carries this notation: "The Aggie Meyers referred to is Sister Josephine Myers of Golden Gate Chapter, Kansas City. . . . Sister Wyatt seeks to blacken the character of a sister by calling her 'Aggie Meyers' a name notorious in criminal annals." In one of Mrs. Wyatt's letters she tells Mrs. Fisher of an Eastern Star celebration recently before held in St. Louis and observes: "Edith (Mrs. Ambruster) was out but she sure looks sick. She looks like a wreck. And I would

think she would, for when a mother turns so money crazy as to try to cheat an only child something should happen to her.'' (This reference being to a lawsuit between Mrs. Ambruster and her son.) [326 Mo. 51, 31 S. W. (2d) 28.] The following are a few of the many illustrative references which might be cited indicating the existence of politics and factions. We shall not pause to comment or elaborate. Mrs. Wyatt writes: ''Sarah is a fine woman. I don't believe that dirty bunch can harm her;'' ''Haven't heard anything from Stange (one of the defendants), I expect he will be with the fighters for that is his kind;'' '' 'Aggie' must have an awful grouch on. What is hurting her. I hear they are going to spring something at Grand Chapter. Say that bunch is always going to do something but they never do anything but let their tongues run off. If they have got anything why wait until Grand Chapter why not start it now. Say they will be found outside and not even looking in if they are not careful.'' Mrs. Wissmath (Adele) writes: ''I heard the Boonville picnic was a flop and the Josephine Myers crowd were all there. Too bad something can't be done to put such folks out of the organization;'' ''I think we must keep on in a dignified way to beat them worse than before;'' ''Hunter of St. Joe wrote Peabody is surely working hard for Camp and we better keep busy for Remley.'' In one letter Mrs. Wissmath (Adele) tells Mrs. Fisher that one ''Zoe Brooks Holman has returned to our city; was at our chapter last night. . . . Wanted you to know she is here. She can go to Edith's (Mrs. Ambruster) and sympathize with her and cook up things for Grand Chapter.'' Mrs. Tate, referring to a ''picnic,'' says: ''Aggie (meaning defendant Josephine Myers) was there and they said kept her eyes on us but I did not see her. I saw her gang and hated to stare that way.'' This completes our attempted resume of the voluminous printed pamphlet which was scattered broadcast at the meeting of the Grand Chapter at St. Joseph, October 9, 10, 11, 1928. As noted the first 11 pages of this printed pamphlet are composed of the newspaper article and the various affidavits purporting to show that a Mrs. Josephine Fisher registered and occupied a room at the Arcade Hotel, in Higginsville, and there cohabited with one C. C. Ehlers, not her husband, as man and wife, on September 21, 1908; that she and the said C. C. Ehlers were arrested and entered a plea of guilty to a charge of ''unlawful cohabitation'' preferred by her husband, R. E. Fisher, in the court of Justice of the Peace Rigg in Higginsville; and that plaintiff Josephine S. Fisher is the same woman.

We next inquire what the evidence shows as to how and by whom the newspaper article and the various affidavits were collected, prepared, printed in this pamphlet form and distributed. According to the testimony of Edward Felgate, the then owner and publisher of the newspaper, the Higginsville Jeffersonian, a witness for de-

fendants, two or three men came to the newspaper office sometime in 1927 and "looked at that paper" (the issue of September 25, 1908). Mr. Felgate stated that they thereafter "came in and looked at that" (the issue of the paper referred to and particularly this article) "several times;" that about "a year after" they "first came and looked at it," they "took a picture of it;" and that he did not know or ask and never "learned any of their names;" and that later, on August 10, 1928, he was called to "Judge Chinn's office." On that date before Chinn, as notary public, Felgate and one Rehkop (whom the pamphlet describes as a photographer) made the affidavit appearing in the pamphlet that the article set out therein was a "true and correct" copy of the newspaper article, entitled "Caught with the Goods," appearing in the September 25, 1908, issue of the newspaper.

The evidence shows that since sometime in 1927, if not earlier, defendant Josephine Myers had the impression and believed that Mrs. Fisher had in several instances wronged her and had consistently endeavored to injure her in her standing and advancement in the Eastern Star. We will not go into the details of these matters. Evidence was offered tending to support Mrs. Myers' suppositions while Mrs. Fisher denied there was, or had ever been, any basis whatever therefor. The inference arises, and it is quite apparent, from the evidence that there was animosity toward Mrs. Fisher on the part of Mrs. Myers. Also one Anna Richards who was Associate Matron of one of the several Kansas City Chapters of the Eastern Star was defeated for Matron in 1927, though as Associate Matron the previous term she would presumably, and in accordance with custom and precedent, be elected Matron that year. She seems to have attributed her defeat to Mrs. Fisher and to have joined Mrs. Myers in a grievance against Mrs. Fisher on that account. We note here that there is not a scintilla of evidence supporting the suggestion that Mrs. Fisher was responsible for Mrs. Richards' defeat. In 1927 and 1928 Mrs. Anna Richards and her husband Alva Richards resided in Kansas City. Alva's father, and Mrs. Richards' father-in-law, C. C. Richards, an elderly but, as will presently appear, nonetheless active man, made his home with them. The elder Richards had formerly resided for many years at Marshall, Missouri. Defendant McGuire resided at Sweet Springs from 1903 until sometime after 1908 and was a member of the Masonic Lodge (Barbee) there. In 1928 he resided at Marshall where he represented the Kansas City Joint Stock Land Bank in the sale of farms in the territory thereabout. He had known C. C. Richards when Richards lived at Marshall. McGuire testified that, after C. C. Richards went to Kansas City "to his son's" home, he (Richards) "handled real estate some;" that C. C. Richards "wrote me he would like to look at some farms" (this seems to have been about March, 1928); and that he and Rich-

ards met at Keytesville and that Richards "rode with me for two days looking at some farms in Chariton and Howard counties and during that time Mr. Richards brought up this happening with Mrs. Fisher and Ehlers calling my attention to it. In fact it had slipped my mind." The following facts concerning the affidavits which he made are gleaned from the further testimony of McGuire and other evidence in the case. Subsequent to the inquires made by Richards while they were on the trip mentioned and sometime apparently in March or the first part of April, 1928, C. C. Richards, his daughter-in-law Anna Richards and defendant Josephine Myers came to see and interview McGuire at Marshall. They asked McGuire at that time to sign an affidavit of some kind apparently of the same nature as those he later signed but he refused saying he would not "make an affidavit until" he could "look at these Masonic Lodge records at Sweet Springs." By prearrangement McGuire met C. C. Richards and Mrs. Myers at Sweet Springs on April 15, 1928. It seems that Okie Myers, husband of Josephine Myers (also a defendant), went to Sweet Springs with his wife and Richards on that occasion though it does not directly appear that he ever discussed the matter with McGuire or directly solicited or obtained the affidavits from him. McGuire having viewed the original copy which he and Prigmore had made in October, 1908, of the docket record or entry of Justice Rigg at Higginsville and the records of Barbee Lodge relating to the charges filed against Ehlers and his trial and expulsion from the lodge, all of which were in the custody of Pelot, the secretary of the lodge, made the affidavits above described, which were later incorporated in the printed pamphlet, before Pelot as notary public. In one of the affidavits one M. D. Jackson, who was then postmaster at Sweet Springs joined. Jackson was not called as a witness. McGuire said that after he executed the affidavit "one of them (C. C. Richards or Mrs. Myers) took it . . . I think Mrs. Myers took it." The plaintiff took the deposition of Okie Myers and introduced it in evidence. He did not testify at the trial. Myers admitted in his deposition that he accompanied his wife and C. C. Richards on three different trips to Sweet Springs to see Pelot but claimed he did not know the purpose of the trips or the nature of the business his wife and Richards were transacting with Pelot. It is certainly not a far-fetched inference that one of the occasions was April 10, 1928, under which date Pelot as a justice of peace made and certified to a copy of the original copy of the justice of peace court record of Justice Rigg and as secretary of Barbee Lodge certified, under the seal of the lodge, to a copy of the proceedings had in lodge trial of Ehlers. Pelot, a witness for defendants, says he ·gave these copies to C. C. Richards and in her deposition, taken and introduced in evidence by plaintiff, Mrs. Myers admits being with C. C. Richards on that trip. Defendant Truesdale's first affidavit, bearing the head-

ing in the pamphlet, "affidavit of the arresting officer," was made at Higginsville on May 10, 1928. The evidence is somewhat confusing about the number of trips and who went to Higginsville to see Truesdale but this much seems certain that on one or more trips Mrs. Myers and C. C. Richards interviewed him and that Mr. Myers went to Higginsville with them though he states, in his deposition, that he did not know and neither his wife nor Richards told him "of the purpose" of any of the various trips to Marshall, Sweet Springs, Higginsville and Aullville, on which he accompanied them. The evidence amply allows the inference that Mrs. Myers and C. C. Richards obtained the affidavit by Truesdale. The Prigmore affidavit, in substance the same as the separate affidavit, of McGuire, was made May 12, 1928. Prigmore was a resident of Sweet Springs for more than twenty years next prior to 1912, when he left there and thereafter resided on a farm in Johnson County, Missouri. Prigmore who was seventy-nine years of age at the time defendants took his deposition, which they introduced in evidence, stated: that a man, whom he would judge to be "older than sixty" but whose name he could not remember ("wouldn't swear it was Richards"), "hired a man to drive him down here (the farm where he resided) and drive me back" to Knobnoster where they went to the bank and under the man's supervision the assistant cashier "typed off" the affidavit and he (Prigmore) "signed it." The affidavits by Eva Anson Phillips and her brother Marion L. Anson were made before their father, Mode Anson, as notary public, on September 10, 1928, at Aullville. Mode Anson stated that Mrs. Myers and "a couple of men who were with her, one of whom I was informed was her husband" were there at the time these affidavits were made. Mrs. Phillips testified that Mrs. Myers and her husband came to her home on this occasion and that she (Mrs. Phillips) made the affidavit "at the solicitation of" and "for Mrs. Myers." Truesdale's second affidavit, appearing in the pamphlet, made September 3, 1928, was obtained in Kansas City on that date by C. C. Richards and his son. By prearrangement Truesdale came to Kansas City that day and met C. C. Richards, who with his son drove Truesdale, in an automobile, along the street in front of the Fisher home, in Kansas City. Truesdale says that as the automobile passed the Fisher residence he saw a man cutting grass and weeds in the yard and at once recognized and identified the man as the same man who twenty years before, and whom he had not seen since, appeared at Higginsville, gave the name of R. E. Fisher and caused the arrest of his wife under the name of Jennie Doe. Thereupon the two Richards. father and son, procured his signature to an affidavit to that effect before a notary public. Mrs. J. Willis Smith of Sweet Springs, at whose home Mrs. Fisher had met her vocal classes, in 1907 and 1908, was called as a witness by defendants. On cross-examination she stated, that Mrs. Myers and a man whose

name she could not recall, "but it was a man who used to live at Marshall," came to her home at Sweet Springs and endeavored to question her about Mrs. Fisher; that she asked them why they were seeking information about Mrs. Fisher; that Mrs. Myers replied: "I can't tell you because you are not an Eastern Star but I assure you your name will never be brought into anything;" and that this occurred in 1928, and prior to the Grand Chapter meeting at St. Joseph.

We next hear of some of these affidavits, and the certified copies of court and lodge records together with some of the stolen letters which appear in the pamphlet in the office of defendant Austin in St. Louis. In 1928 Austin was president of a corporation publishing a Masonic newspaper, "The St. Louis Masonic Journal." He and his wife, Adda, to whom reference is made in some of the letters printed in the pamphlet, were members of the Eastern Star and his wife seems to have been active and prominent in Eastern Star circles. Plaintiff put in evidence the deposition of Mrs. Lucia Beck of St. Louis who testified that she was employed by Austin in April, 1928, in the advertising department of the St. Louis Masonic Journal and worked "out of Mr. Austin's office;" that she continued in that employment "until the latter part of July;" that during that time John P. Skerrett was employed by Austin and was "in charge of advertising" for the Journal; that during the time she was employed by Austin, Skerrett showed her and had her read "proof copy" of various affidavits, the newspaper article, court and lodge records and some of the letters, which were printed in the pamphlet; that he was compiling this "data" for publication; that the originals of the letters signed Genevieve and printed in the pamphlet were in Austin's office and that Skerrett showed them to her and she read them; that Skerrett said: "These court records talk, they speak for themselves" and "what more does anyone want" and that she read the purported lodge and court records, which later appeared in the pamphlet; that Austin was present "at times" and saw her "reading them" and "at different times told Skerrett to put them away;" that she heard Austin and Skerrett "arranging trips" in connection with the collection of these documents; that Skerrett said, in reference to these trips "out of town," that "he was after Mrs. Fisher;" that, in this connection, trips were made to Higginsville and Kansas City; that when "he came back he would show me some more of these things" and say "here's some more;" and that the "information" which he got on these trips "out of town was on Mrs. Fisher."

In her deposition Mrs. Ambruster admits that Austin had shown her copies of some of these stolen letters which were printed in the pamphlet, and the evidence perhaps warrants the inference also a photostatic copy of the newspaper article, before the meeting of the General Grand Chapter of the Eastern Star at Denver, Colorado, July

22-26, 1928, which she attended. At this General Grand Chapter meeting Mrs. Ambruster talked with defendant Dr. Grow, who was "a Past Most Worthy Grand Patron," about the content of some of the stolen letters which later, in October of that year, appeared in the pamphlet, and at that time Dr. Grow said he had seen these letters and was familiar with their content. Having learned that "Mrs. Fisher was a candidate for office in the General Grand Chapter" Mrs. Ambruster petitioned Dr. Grow "to talk to the Most Worthy Grand Matron about it and ask her not to give Missouri anything." Dr. Grow said: "I talked to her about it and I am afraid she is." Thereupon Mrs. Ambruster personally took up the matter with the Most Worthy Grand Matron. Plaintiff had evidence that at the meeting of the Grand Chapter in 1923, when Mrs. Fisher was elected as a member of the Advisory Board, defeating Mrs. Ambruster for re-election, Mrs. Ambruster said, shortly after the election: "I am going to get even with Josephine Fisher for this, if it is the last thing I ever do" and "if it takes the rest of my life and $5000 I am going to get even." Mrs. Ambruster, at all the times mentioned, resided in St. Louis and is referred to, by her counsel, as "a substantial business woman."

Defendant Dr. W. W. Grow was an "osteopathic surgeon" at St. Joseph, Missouri, where he had resided for twenty years or more prior to the trial of this case and was fifty-one years of age. As we have noted he was a man of prominence in the Order of Eastern Star. His wife also was prominent in the Order. He was well acquainted with defendant Austin and had known defendant Ambruster for twenty-five years having first met her at a meeting of the General Grand Chapter (which meets at three-year intervals) and had since met her and been associated with her, as well as Mrs. Fisher, in Eastern Star work both in the General Grand Chapter and in the "Grand Chapter of the Missouri Order of the Eastern Star."

Defendant C. L. Stange did not testify nor was a deposition by him put in evidence. From the deposition of defendant Austin it appears that Stange resided in St. Louis. Austin said he had been acquainted with Stange "for several years" as "a Masonic fraternal worker in St. Louis." Mrs. Ambruster said in her deposition that Stange called her over the telephone and told her he had "carbon copies" of some letters that contained "some interesting articles" about her. She then says that later Austin "dropped in at my house and showed me these carbon copies." These were copies of some of the stolen letters appearing in the printed pamphlet and this incident occurred before Mrs. Ambruster went to the General Grand Chapter meeting at Denver in July (1928).

We note here that the six defendants, who were members of the Eastern Star, Josephine Myers, Okie Myers, Austin, Grow, Stange and Mrs. Ambruster, did not testify at the trial. The two remaining

defendants, Truesdale and McGuire, who were not members of the Order did testify. The voluminous evidence discloses innumerable side lights, circumstances and incidents which tends to reveal motive, feeling and relationship of the parties to this action, who were members of the Order, and others, mentioned in the evidence, who were connected with the course of events, which because of the limitations of this statement we cannot, if we were able to do so, enumerate here or undertake to develop.

We come now to the distribution of the pamphlet at the meeting of the Grand Chapter at St. Joseph, October 9, 10, 11, 1928. The meeting was held at the Auditorium in St. Joseph. The main entrance opened into a lobby or corridor. From this lobby doors opened into the "assembly room." Between 2500 and 3000 delegates, officers, and visitors from various sections of the State attended the Grand Chapter meeting also officers or representatives of the Order from other jurisdictions were present. The delegates and those who constitute the Grand Chapter, the present Grand officers, Past Grand Matrons and Patrons and the Matrons and Associate Matrons of the Missouri Chapters, were admitted to the main floor of the "assembly room." Other members of the Eastern Star were permitted to attend as visitors but not admitted to the main floor and were seated in the balcony. It seems a preliminary ceremony is held at the opening of the first session of the Grand Chapter, between ten or ten-thirty and eleven o'clock of the morning of the first day; an address of welcome, the introduction of and invitation to the Grand officers to assume their respective stations, the taking thereof by the Grand officers, a "flag ceremony," and thereafter the introduction of Past Grand Matrons and Patrons and the response thereto after which they are invited and privileged to sit in the "Grand East." Mrs. Fisher, who as a Past Grand Matron, would later, in the order of procedure mentioned, be introduced and invited to sit in the "Grand East," the platform being designated for the session as such, was seated, during these preliminary ceremonies, "well toward the rear of the assembly room."

The following facts were shown by plaintiff's evidence. Shortly after the commencement of the preliminary ceremonies in the assembly room, and but a few minutes thereafter, defendant Grow accompanied by a "drayman" carrying a "big box" containing these printed pamphlets, "Read and Be Convinced," entered the lobby through the main entrance. The box of pamphlets was placed in the lobby, at least for a short time, and Grow was joined by defendants Ambruster and Stange. They "started to passing" the pamphlets "around to the people" in the lobby. Mrs. Ambruster and Stange each took "a big bundle." Mrs. Ambruster first tried to place some of the pamphlets on the "information table" and on another table in the lobby from which a newspaper "Eastern Star News" was

being distributed but the women in charge would not allow her to do so. She then took "a big bunch" of the pamphlets and went "inside" and distributed them in the balcony. Mrs. Myers, who was not entitled to a seat on the main floor, was in the balcony at this time. Stange while handing out pamphlets told "a lot of men standing around there" in the lobby that the content of the pamphlet "was the truth." Grow "took some of them (pamphlets) up under his coat" and went into the assembly room and back of the stage where "he took them out and passed them around to persons behind the curtain." The preliminary ceremonies mentioned were in progress during this time. Mrs. Wissmath "made the speech of welcome and invited the Grand officers to come into the Chapter room" and the Grand officers took "their respective stations." The flag ceremony followed shortly thereafter, after which Dr. Grow, having obtained recognition, "took the floor" and, with a fervor worthy of a better cause, moved "that in the name of the flag and for the good of the flag and for the good of the Order of the Eastern Star Josephine S. Fisher be expelled from the privileges of this Grand Chapter and that her position on the Advisory Board of the Masonic Home be declared vacant." The motion was seconded but before it could be further pressed the presiding officer, the Worthy Grand Matron, promptly declared and ruled it out of order. So far as this record shows such procedure was not authorized by Eastern Star law or precedent. Plaintiff's witnesses say that as, or "at the time," Dr. Grow made the motion, and "almost simultaneously" therewith "pamphlets began raining," "were thrown down from the balcony," "flew around there like wild fire," and that Mrs. Ambruster and Stange "threw piles" of pamphlets "into the laps of the people" seated near the aisles "in the back of the house" (on the main floor). When the Grand Matron ruled the motion out of order Stange appealed from the ruling stating "something about a pamphlet being in circulation" and Mrs. Ambruster went to the platform and made a speech. Plaintiff had evidence that in this speech Mrs. Ambruster declared that she favored Dr. Grow's motion; that "we should give Brother Grow thanks for the information he had brought to the Grand Chapter" and "for bringing this matter before the Grand body;" and that "she felt now that the meeting should be given an opportunity to see this book (holding one of the pamphlets in her hand) and read what was in it so they could know what it contained." On a vote the ruling of the Grand Matron was sustained and she thereupon forbade the further distribution of the pamphlet. When the Grand Matron made this ruling "Mrs. Ambruster laid all the pamphlets she then had on the platform and said 'I can't give them to you, but you can come and help yourselves.'" Later, in the regular course of procedure, the Past Grand Matrons and Past Grand Patrons present were introduced and "invited to sit in the East." Mrs. Fisher

as a Past Grand Matron participated in this ceremony. At the close of the morning session and as the delegates and visitors were leaving the auditorium for the noon recess the pamphlets were distributed in the lobby. Mrs. Ambruster busied herself during the noon recess in placing supplies of the pamphlets at various places within and about the assembly hall where they would be conveniently accessible to persons desiring to obtain them when the Grand Chapter reconvened in afternoon session. Mrs. Austin, wife of defendant Austin, was identified as one of the persons who stood outside the door and handed out pamphlets at the noon recess. Mr. and Mrs. Austin went to St. Joseph on Sunday preceding the Grand Chapter meeting commencing on Tuesday and remained throughout the meeting.

During the first day Mr. Kirchner, of Clayton, Missouri, a Past Grand Patron, had a conversation with Stange and told him that he (Kirchner) "doubted that these letters (published in the pamphlet) were genuine." Whereupon Stange went to Grow and got one of the original letters and exhibited it to Kirschner. Dr. Grow also told Kirchner that he (Grow) "had other letters," meaning other originals of the "stolen" letters, "and could produce them." While the Grand Chapter was in session Dr. Grow told a group of several men "back of the stage" and "back of the curtain," in the assembly room, "that every word in that pamphlet is true." After the afternoon session on the first day defendant Okie Myers and Mr. Richards, the testimony does not state whether the elder or younger Richards, under the supervision of Mrs. Myers took a "large package" of the pamphlets from a room in the auditorium to a hotel. The pamphlets were distributed and scattered about during the following two days of the meeting. They were found in restaurants, hotel lobbies, drug stores and other public places in St. Joseph.

Truesdale was brought to St. Joseph. He says he "was around there three days" while the Grand Chapter was in session. He seems to have been in the care of Mr. and Mrs. Myers, C. C. Richards, and Alva Richards and his wife all of whom were there. From Truesdale's testimony we collect the following; that prior to the Grand Chapter meeting C. C. Richards (the elder) asked Truesdale to go to St. Joseph during the meeting and told "me they would want to use me up there;" that the elder Richards "wanted to see whether I could identify Mrs. Fisher;" that he went to Kansas City and the "young man Richards" took him to St. Joseph in his automobile and provided a room for him there; that C. C. Richards and Mrs. Myers, one or both, took him to the lobby of the Roubidoux Hotel, in St. Joseph and stationed him near an elevator; that he "stood there for an hour or longer alone;" that then he saw a group "of five or six women" "on the elevator" and he recognized and identified one of them as the plaintiff. Mrs. Fisher, and as being the same woman whom he had arrested twenty years before at Higginsville and had

never since seen until that moment. Truesdale says that, at that time, "Mrs. Myers or Mr. Richards one was standing back there ten or fifteen feet and I stepped back and said: 'That is her right now, that is Mrs. Fisher.'" His best impression is that Mrs. Myers was the one who was standing back of him, waiting and watching, and to whom he made his report. Truesdale, who was not a member of the Eastern Star, further testified, that "several of them introduced me around up there (at St. Joseph during the Grand Chapter meeting), and when asked: "Who did the introducing when you met people?" Truesdale said: "First one and then another. Sometimes Mrs. Myers, sometimes Mr. Myers, sometimes Mr. Richards and young Mr. Richards introduced me to some of the men." Truesdale admitted that he was paid for his various services but said he did not know how many times he was paid or how much. "Brother Richards," as the witness referred to the elder Richards, "in this connection, was the paymaster."

Mrs. Gary, of Kansas City, was serving at the Marshal's station. During one of the sessions, not definitely fixed, she was sent on a mission for the Grand Matron which took her "back of the stage" where she saw "Mrs. Myers, Mr. Stange, Mrs. Ambruster and Mrs. Richards talking to Mr. Martin, the newly elected Worthy Grand Patron. Mrs. Gary observed Mrs. Myers "shake her fist in Mr. Martin's face" and heard her say (addressing Martin), "Demand that resignation." Mr. Martin replied, "I will not." Whereupon Mrs. Myers made some remark which the witness did not understand but to which Mr. Martin replied: "Well, if you do that, I won't be here. I will leave." Shortly after this incident the witness says Mrs. Fisher "was called back of the stage." Mrs. Fisher says that when she went "back of the stage" in response to a request, she found Mrs. Myers, Stange, Grow, Mrs. Ambruster and a Mrs. Camp awaiting her. Mrs. Ambruster, as spokesman, demanded that Mrs. Fisher resign her position as a member of the Advisory Board. The term for which Mrs. Fisher had been elected did not expire until one year later. Mrs. Fisher refused the demand. On the following day the demand for her resignation was renewed and Mrs. Fisher stated that while there was no law of the Grand Chapter authorizing such a committee and such an investigation if those demanding her resignation would agree to the appointment of an investigating committee before whom she could appear and "prove myself innocent" she would resign. The appointment of a committee was agreed upon and Mrs. Fisher resigned from the Advisory Board.

Mrs. Fisher commenced this action October 9, 1929. The petition charges that the eight defendants "with others plaintiff is now unable to name, for the purpose of destroying plaintiff's reputation and for the purpose of maligning and reflecting upon plaintiff's reputation, and for the further purpose of humiliating and injuring this

plaintiff, entered into a conspiracy or an agreement among themselves to cause to be assembled and published certain purported affidavits and documents and to cause same to be printed and bound into a volume or pamphlet and in furtherance of said conspiracy did print such pamphlet of and concerning plaintiff and maliciously caused several hundred of said pamphlets to be distributed among the delegates and visitors at the Grand Chapter of the Order of Eastern Star at St. Joseph, Missouri, on or about October 9, 1928;" "in said pamphlet was printed the following false and malicious statements, affidavits and articles, to-wit;" and the newspaper article and the various affidavits and certificates printed in the pamphlet are then set out in full. The defendants Josephine Myers, Okie Myers, John P. Austin, W. W. Grow and C. L. Stange, all members of the Order of the Eastern Star, joined in an answer in which all the matters and things stated in the pamphlet in reference to the Higginsville episode therein alleged to have occurred September 21, 1908, are set out as facts and as being true and it is alleged that the woman involved "was Josephine S. Fisher, the plaintiff." The answer then concludes: "So these answering defendants say that the foregoing facts, as substantially set forth . . . in the pamphlet mentioned in plaintiff's petition were and are true." Thus these defendants do not deny the allegations of the petition that they "entered into a conspiracy or agreement among themselves" to do so and did cause the affidavits and other documents set out in the pamphlet to be assembled, printed and published in pamphlet form and distributed at the Grand Chapter meeting at St. Joseph. Nor do these defendants plead, as did defendant Ambruster in a separate answer, that as members of the Eastern Star their action in compiling, printing and distributing the pamphlet at the Grand Chapters meeting was qualifiedly privileged. The answer, in effect, admits that the defendants joined therein did unite in a common understanding and design to do so and did cause the pamphlet to be compiled, printed and distributed as charged but say that the charges contained in the pamphlet are true; that is the sole defense pleaded. Their position is, we admit we did what plaintiff alleges but the charges we made and published against plaintiff are true. Defendant Truesdale, who was not a member of the Order of the Eastern Star, by his separate answer, admits that he made the two affidavits shown by the pamphlet to have been made by him and says he "believed then and believes now and so states the fact to be that said affidavits are true." He denies that he entered "into any conspiracy or agreement" with the other defendants, "or any of them" to compile, print, or circulate the pamphlet and says he "has no malice or ill will of any kind against plaintiff." Defendant McGuire, who was not, "and never had been," a member of the Eastern Star, by his separate answer, admits that at the request of "one Richards" he signed the

affidavits "which appear in the petition as having been signed by him" but denies that he entered "into any conspiracy or agreement" with the other defendants "or any of them" to compile, print or circulate the pamphlet. He further states, that "he did not know Josephine S. Fisher . . . had no malice or ill will of any kind or character against" her and that "he had nothing whatever to do with the preparation of said pamphlet and did not know that his affidavit was inserted in said pamphlet until he was served with summons in this suit and that he had nothing to do with the circulation or distribution of said pamphlet." All the above seven defendants were represented by the same counsel. Other counsel represented defendant Ambruster and by her separate answer, as the writer understands from statements of appellants' counsel in his brief, the answer not being in the record, denied that she was a party to any understanding or agreement to compile, print, or distribute the pamphlet or that she had any part in doing so; and also pleads qualified privilege and the truth of the charges against plaintiff.

We have set out the substance of plaintiff's evidence also the testimony of plaintiff and her husband to the effect that Mr. Fisher was never in Higginsville after August 30, 1908, when he met his wife there by prearrangement. And it will be recalled Mrs. Fisher testified that after that date she did not again go to Sweet Springs or Aullville to meet her classes and was never in Higginsville after the August 30, 1908, date when her husband returning from St. Louis met her there. They deny *in toto* the charges and implications of the various affidavits and other matter set out in the pamphlet purporting to show that Mrs. Fisher was guilty of adulterous relationship with one Ehlers at the time and place mentioned. Both Mr. and Mrs. Fisher testified that they had never heard of the alleged episode at Higginsville in September, 1908, had never seen or heard of the newspaper item or that a man under the name of R. E. Fisher had at that time caused the arrest of his wife on the charge of unlawful cohabitation with one Ehlers, until this pamphlet was distributed at the Grand Chapter meeting in 1928. Defendants adduced evidence tending to show and substantiate the truth of the facts set forth in the pamphlet and that plaintiff Josephine S Fisher and her husband R. E. Fisher were the same persons as Josephine Fisher and R. E. Fisher referred to therein and involved in the Higginsville episode.

The jury was fully instructed on the part of these appealing defendants, that if they found that plaintiff was "the woman who was arrested in the Arcade Hotel at Higginsville. Missouri, on September 21, 1908, and thereafter plead guilty before Justice J. E. Riggs then and in that event your verdict must be for defendants, and this regardless of the time intervening, of any motives of any parties in the publication, or the malice or ill will of anyone in the circulation of the report of said episode." And even this instruction (which we

are not to be understood as ruling) was given, on the part of the appealing defendants: "That where there is an identity of names it is presumed that they are one and the same person and the party denying such identity has the burden of overthrowing such presumption." But upon this primary issue of fact and the defense of truth, upon which alone defendants Josephine Myers, Okie Myers, Austin, Stange and Grow relied, the jury elected to believe plaintiff's evidence and found for plaintiff. The issue of the truth of the charge was even more fully submitted in the instructions on the part of defendant Ambruster. All the instructions asked by these appellants were given without modification. We have noted this only for the purpose of observing that the defense that the charge made in the pamphlet was true was submitted in the manner, form and to the extent requested by appellants and in a way that was certainly not unfavorable. No instructions were asked on the part of either McGuire or Truesdale on the defense raised by their answers that they were not parties to and did not participate in any understanding or agreement to compile, print and distribute this pamphlet.

At the close of all the evidence in the case each defendant offered a separate and individual motion for a directed verdict, in the nature of a demurrer to the evidence, and each separately urges here that the trial court erred in overruling and refusing same. We first consider the contention of defendants McGuire and Truesdale. As to McGuire it will be recalled that it is not charged that by merely making the two affidavits (in April, 1928) reproduced, with those of other persons, in the printed pamphlet and turning them over to others he libeled plaintiff but that he was a party to and participated in a conspiracy to assemble the various affidavits and documents, have "same printed and bound into a volume or pamphlet" and distributed at the meeting of the Grand Chapter at St. Joseph the following October. His answer denies any knowledge of or participation in such understanding, conspiracy or purpose. It was incumbent upon plaintiff to adduce substantial evidence tending to show that McGuire knowingly participated with others as charged in the alleged conspiracy or arrangement to assemble these various affidavits and documents and have them printed in pamphlet form and distributed at the Grand Chapter "for the purpose of maligning and reflecting upon plaintiff's reputation," etc. There is not a scintilla of evidence tending to show that the affidavit in which McGuire joined with one Jackson, to the effect that as members of the Masonic Lodge at Sweet Springs (Barbee Lodge) in 1908 they were present in meetings of the lodge when charges of un-Masonic conduct, "carnal intercourse with a brother Master Mason's wife," were filed, trial had and Ehlers expelled, was not true. The affidavit does not state the name of the woman involved or the name of her husband nor does it attempt to identify plaintiff as being the woman involved in the charge against

1220

Ehlers. Nor is there any evidence disputing the truth of the affidavit by McGuire, and the like affidavit of Prigmore, that the copy of the record of Justice of Peace Rigg in the files of Barbee Lodge is the same copy which the justice of the peace made and certified to in 1908 when McGuire and Prigmore acting for, and delegated by, the lodge viewed the record and procured a copy thereof for use in the trial of Ehlers on charges preferred by the proper officer in the lodge. There is no substantial evidence that McGuire knew for what purpose or use Richards and Mr. and Mrs. Myers desired these affidavits or that he knew or had even heard of any scheme or plan to have them printed in a pamphlet with other affidavits and documents charging and identifying plaintiff as being the woman involved in the episode with Ehlers. It does not appear that at any subsequent time he was in any way connected with the working out of the scheme or knew anything about what was being done. He testified that he never heard any more about the affidavits made in April, 1928, until after the Grand Chapter meeting the following October when a copy of this pamphlet came to him "through the mail." The inference from the testimony in reference to the procurement of these affidavits by Mr. and Mrs. Myers and the Richards family is that neither McGuire nor Prigmore was advised of the purpose thereof, the impression conveyed being that they were required in connection with proceedings pending in the Eastern Star. Whatever one's personal opinion may be of the propriety of McGuire, Prigmore, Pelot and others disclosing the proceedings had in the Masonic lodge and the records and files of the lodge and the giving out of copies thereof supported by affidavits and the seal of the lodge in the manner and as was done in this instance, nevertheless from the standpoint of making out a submissible case against McGuire upon the charge laid in the petition we think the evidence too faint and insubstantial and that a verdict should have been directed in his favor.

█ Truesdale's separate answer, substantially like the answer filed by McGuire, denied that he was a party to the alleged conspiracy, etc. However, the evidence connects Truesdale with the scheme from well nigh its inception to its consummation. True he seems to have been a mere pawn in the hands of the Richards and the Myers but a jury could justifiably infer and find that in his various activities he knew, and must have known, the purpose, nature and extent of the scheme or plan which he was being used to further and to have knowingly participated therein. We have set out the evidence bearing upon Truesdale's part in the matter and we deem it unnecessary to review or analyze it here. It is our conclusion that the court properly overruled defendant Truesdale's demurrer to the evidence.

█ The argument advanced here in support of the separate demurrers to the evidence of the other five appealing defendants, Josephine Myers, Okie Myers, Austin, Grow and Stange, all mem-

bers of the Eastern Star, is the same. The contention that there is not substantial evidence that they, and each of them, intentionally and knowingly participated in and severally contributed to the alleged conspiracy and understanding to assemble, compile, print and distribute the pamphlet and acted in concert with a common design and purpose in doing so, is not urgently stressed. As we have noted these five defendants filed a joint answer. They did not deny the conspiracy or joint understanding and action alleged in the petition, either generally or specifically. However we are not inclined to dispose of this phase of the case on the theory that the material and essential allegations of the petition in that respect not having been denied by these five defendants must be taken as confessed as to them (James v. Kansas City Gas Co., 325 Mo. 1054, 30 S. W. (2d) 118) since by reference to the resume of the evidence we have made it will, we think, sufficiently appear that substantial evidence was adduced from which a jury might properly infer and find that each of these defendants knowingly participated in an understanding, arrangement or scheme to assemble the material therein and print, publish and distribute the pamphlet.

We have also noted that the joint answer of these five defendants does not contain a plea of privilege, or qualified or conditional privilege, nevertheless it is contended that from the relationship of the parties, as members of the Eastern Star, the occasion and the existing conditions, as shown by plaintiff's own evidence, it conclusively appears that their acts were privileged and therefore plaintiff's case fails though they did not plead privilege as a defense. [Kersting v. White, 107 Mo. App. 265, 281, 80 S. W. 730, 735.] No claim of absolute privilege is made, nor would it apply, and our discussion is confined to the question of qualified privilege only. A situation may be such that a defamatory utterance, communication or publication may, in the absence of express or actual malice, to be qualifiedly privileged even though it is not true. "Briefly stated, a qualifiedly privileged communication is a defamatory communication made on what is called an occasion of privilege without actual malice. As to such communication there is no civil liability." [36 C. J., p. 1241; Lee v. W. E. Fuetterer Battery & Supplies Co., 323 Mo. 1204, 23 S. W. (2d) 45.] Assuming, as these five defendants contend, but without so holding, that plaintiff's evidence conclusively shows "an occasion of privilege" nevertheless the same evidence disclosed and developed facts, incidents and circumstances, which we deem it unnecessary in view of the extended statement we have made, supra, to here collect and enumerate, from which a jury might well find actual or express malice on the part of these five defendants and therefore makes out a prima facie case against them. [Wagner v. Scott, 164 Mo. 289, 63 S. W. 1107; Sullivan v. Strahorn-Hutton-Evans Commission Co., 152 Mo. 268, 53 S. W. 912; Lee Meriwether v. Publishers, George

Knapp & Co., 224 Mo. 617, 123 S. W. 1100; Overton v. White, 117 Mo. App. 576, 93 S. W. 363; Kersting v. White, 107 Mo. App. 265, 80 S. W. 730.]

But does plaintiff's evidence or the evidence as a whole show "an occasion of privilege?" In view of other assignments of error which these five appellants make we are required to rule this question. Apparently these defendants with full knowledge of the circumstances under which the pamphlet was circulated did not consider the occasion one of qualified privilege for they did not plead that defense in their joint answer and elected to rely wholly and solely upon justification or truth of the charge made against plaintiff. The uncontradicted evidence is that neither the Grand Chapter nor the delegates to or members thereof and certainly not the visitors in attendance thereon had any duty, authority or original jurisdiction to investigate, hear, or pass upon charges of alleged misconduct of a member of the Order or to expel such member or deprive her of the rights and privileges of membership or power to discipline her. Such duty and authority is vested solely in the local chapter of which the alleged wrongdoer is a member. The evidence is that the local chapter alone has such original jurisdiction by the procedure provided by the laws and precedents of the Order to entertain, hear and determine charges of immorality or misconduct of any kind affecting a member's moral fitness or her membership in the Order. The local chapter alone is vested with the power and duty of discipline and only by and through the proper procedure in the local chapter can a member be deprived of the rights and privileges incident to membership in the Order or subjected to discipline by the Order. Certainly the investigation and presentation of charges by members of the Order against a fellow member in the local chapter of which she is a member instituted and carried on according to the procedure provided by the laws of the Order when done in good faith, upon probable cause and without actual malice, is qualifiedly privileged. So statements or communications made in good faith and without actual malice in the course of such a proceeding or action are qualifiedly privileged. [36 C. J., p. 1269; 17 R. C. L., p. 369; Landis v. Campbell, 79 Mo. 433; Bass v. Matthews (Wash.), 124 Pac. 384; Garcia v. Sociedad de Obreros (Tex. Civ. App.), 263 S. W. 943.] There is no evidence to the effect that either the laws, obligations, or tenents of the Order of the Eastern Star imposed any legal, moral or social duty upon a member who acquires information of a fault or wrongdoing of another member to communicate that information to other members of the Order generally or individaully merely as a matter of information. The duty, if any there is, is to the local chapter, as such, which alone has disciplinary power and the duty and authority in respect to the alleged offense. A qualifiedly privileged communication has been defined, with slight variations in statement, in substance

as follows; A communication made in good faith, without actual malice, upon a subject matter in which the author of the communication has an interest, or in reference to which he has a duty, either legal, moral or social, to a person having a corresponding interest or duty. [36 C. J. 1241; 17 R. C. L., p. 341; Newell Slander & Libel (4 Ed.), p. 416; Lee v. W. E. Fuetterer Battery Supplies Co., supra; Holmes v. Royal Fraternal Union, 222 Mo. 556, 121 S. W. 100; Kersting v. White (Mo. App.), supra, 63 A. L. R. 650.] It will be recalled that in addition to the delegates and officers composing the Grand Chapter a large number of members of the Order who were not members of the Grand Chapter were in attendance at the various sessions of the Grand Chapter and were admitted to and seated in the balcony as spectators. These pamphlets were distributed generally and promiscuously among those present in the Auditorium both on the floor of the Grand Chapter and in the balcony, and as those in attendance entered and left the building. These five appellants seem to take the position that merely because they and the some 2500 to 3000 other persons present at the various sessions of the Grand Chapter were members of the Order that such a common interest and duty existed in reference to the matter charged and communicated as to make the occasion privileged and the pamphlet a qualifiedly privileged communication. Recurring to the definition, supra, of a privileged occasion and a qualifiedly privileged communication, applicable to a situation such as we have in the instant case, we are of the opinion that the common and corresponding interest between the author of the communication and the persons to whom the communication is made, in the subject matter of the communication, contemplated is a more direct and specific interest than merely common membership in a church or fraternal order or other similar organization—that it is an interest connected with and incident to a common and corresponding duty of some definite nature. Mere common membership in such an organization, and that alone, does not afford that common interest in the subject matter which makes a communication otherwise libelous qualifiedly privileged; it is too remote. To hold that common membership in such organizations or societies alone, might be seized upon as a shield against liability for slanderous utterances and communications would, we think, be extending the doctrine of qualified privilege too far. [Ballew v. Thompson (Mo. App.), 259 S. W. 856; Hocks v. Sprangers (Wis.), 87 N. W. 1101.] As we have pointed out, supra, preliminary to our statement of the essential requirements of qualified privilege as applicable to this situation, there was no common or corresponding duty on these five defendants and the several thousand members of the Order present in St. Joseph, among whom defendants circulated the pamphlet, in reference to the subject matter of the pamphlet charging Mrs. Fisher with immorality. If these defendants were actuated by a righteous indignation and the professed high

1224

motives of purity, peace and harmony within the Order and the "good of the flag and the good of the Order of the Eastern Star," etc., and were impelled by a sense of duty to take some action to discipline Mrs. Fisher or prefer charges of moral unfitness against her then their duty in that respect was to follow the procedure prescribed by the Order in such cases and present the matter in a proper way in the local chapter of which she was a member and which under the laws of the Order was vested with the duty, authority and jurisdiction to act. According to this evidence there alone was the common and corresponding duty in reference to such a matter which the law contemplates and allows as qualifiedly privileged. So far as the evidence shows there was no duty under the obligations or duties of membership, or any moral or social duty, upon these defendants to communicate scandalous and libelous information about plaintiff, a sister member, to members of the Order generally merely as a matter of information. The motion made in the Grand Chapter to remove Mrs. Fisher from the office which she held, the term of which did not expire until a year later, and deprive her of the rights and privileges of the Order without charges or notice, or opportunity for investigation or hearing, was, according to the evidence in this record, without authority, precedent, or basis in Eastern Star law, usage or procedure, and was but a flamboyant gesture tending to show actual malice and doubtless was one of the circumstances considered by the jury in assessing punitive damages. It affords no ground for a claim of qualified privilege in circulating the pamphlet. It is our conclusion that upon the undisputed evidence no "occasion of privilege" was shown.

The five appellants, who were members of the Eastern Star, make this assignment of error: "This being a case of qualified privilege (though they did not either plead or ask instructions submitting that defense) the court committed error in giving plaintiff's Instruction 7 telling the jury that 'malice . . . as used in these instructions does not mean mere spite or ill will but it means the intentional doing of a wrongful act without just cause or excuse.'" In support of this contention cases are cited holding that where the occasion is qualifiedly privileged plaintiff, in order to recover, must show actual or express malice. This assignment however is disposed of by our holding that the occasion was not one to which qualified privilege extends. The question of whether an occasion is one of qualified privilege is for the court. [Warren v. Pulitzer Pub. Co., 336 Mo. 184. 78 S. W. (2d) 404.]

Plaintiff's main instruction numbered 1, authorizing a verdict for plaintiff, enumerates very clearly and distinctly all the essential facts which the jury were required to find and appellants make no criticism thereof. As to the alleged conspiracy agreement or understanding the instruction requires the jury to find that, "the de-

fendants entered into an agreement or understanding among themselves to publish the pamphlet referred to in the evidence,'' etc., and ''that in furtherance of such agreement, or understanding, if you so find, the defendants acting for a common purpose, did publish such pamphlet,'' etc. It will be observed that under this instruction the jury, in order to find for plaintiff and against any of the defendants, were required to find that such defendants entered into an agreement or understanding to publish the defamatory pamphlet and that pursuant to and in furtherance of such agreement or understanding and acting ''for a common purpose'' did publish same. The court also gave plaintiff's instruction numbered 8 as follows: ''The court instructs the jury that evidence in proof of conspiracy will generally be circumstantial and it is not necessary, for the purpose of showing the existence of the conspiracy, if any, as defined in other instructions, for the plaintiff to prove that the defendants came together and actually agreed upon a common design or purpose, and agreed to pursue such common design and purpose in the manner agreed upon, if so, it is sufficient if such common design and purpose is shown to your satisfaction by circumstantial evidence, if so.'' Disregarding the plain and definite requirements of plaintiff's Instruction 1, appellants point to this Instruction 8 and contend that the jury were told they could find that a conspiracy existed ''without an agreement or understanding which is an essential element of a conspiracy.'' Instruction 8 is clumsily and awkwardly worded and can hardly be commended as a model nevertheless, we think, it does not tell the jury, as appellants contend, that they can find a conspiracy existed without an agreement or understanding but merely that ''for the purpose of showing the existence of the conspiracy'' charged it was ''not necessary'' for plaintiff to ''prove'' that defendants met or ''came together and agreed upon a common design or purpose'' and ''to pursue such common design and purpose.'' The effect is that it was not necessary for plaintiff to show a meeting, assembling or coming together of the defendants at which an agreement was entered into. It will be recalled that three of the defendants resided in St. Louis, two in Kansas City, one in St. Joseph, one at Marshall and the remaining defendant at Higginsville. The evidence did not show any meeting or assembly of all the defendants or group of the defendants at which an agreement or understanding was entered into to pursue a certain course of action. However the course of events, shown by the evidence, were such and the incidents and circumstances so interwoven and so fitted together as to afford substantial evidence from which the jury would be warranted in inferring and finding, in conformity with the requirement of Instruction 1, that such an agreement as the law contemplates did exist. We are not inclined to think that Instruction 8 could have misled the jury or have served to divert them from the plain directions of Instruction 1. Appellants also attack Instruction 8 as being

a prejudicial "comment upon the evidence." In this connection they point·to the observation "that evidence in proof of conspiracy will generally be circumstantial." This comment, we agree, should not have been made and had no place in the instruction but we cannot hold with appellants that the comment so singles out, "glorifies" and "magnifies" circumstantial evidence as a "type" that it amounts to prejudicial error. Upon the whole record these defendants had a fair trial, the only defense relied upon by the five defendants, members of the Eastern Star, answering jointly, was justification, truth of the charge made against plaintiff. Their case was tried upon that theory, their evidence directed to that end. We have purposely referred to the very favorable instructions given at their request and that all the instructions asked by them, and Truesdale as well, were given. We are not inclined to believe that plaintiff's Instruction 8 though loosely drawn prejudicially affected defendants' cause.

No assignment is made that the verdict is excessive and we have therefore not set out the evidence bearing upon the actual damage suffered nor since we are not called upon to do so have we considered the amount of the verdict or whether under the evidence it is excessive.

Appellants do make one other and very general assignment of error and the following is all that is said about it: "The verdict was the result of bias and prejudice." In support of this assignment it is said that the "entire speeches of" the attorneys for plaintiff "have been set out in the bill of exceptions. They are so filled with prejudicial statements calculated to bring about just such a verdict that we do not wish to stress any particular portion but complain against the entire arguments." This is too general for us to undertake to pass upon it.

The judgment of the trial court is affirmed as to defendants Josephine Myers, Okie Myers, John P. Austin, W. W. Grow, C. L. Stange and John W. Truesdale, but reversed as to defendant John H. McGuire. *Hyde* and *Bradley, CC.*, concur.

PER CURIAM:—The foregoing opinion by FERGUSON, C., is adopted as the opinion of the court. All the judges concur.